PEOPLE v BAHODA

Docket No. 98041. Argued November 2, 1994 (Calendar No. 8). Decided March 22, 1995. Rehearing denied *post,* 1225.

Saad Bahoda was convicted by a jury in the Oakland Circuit Court, Richard D. Kuhn, J., of conspiracy to possess with intent to deliver and to deliver in excess of 650 grams of cocaine. The Court of Appeals, HOOD, P.J., and CAVANAGH and R. J. TAYLOR, JJ., reversed in an opinion per curiam, finding that the defendant was denied a fair trial because the cumulative prejudicial effect of comments by the prosecutor during trial and closing argument regarding his ethnicity could not have been cured by instruction, and that admission of evidence regarding the defendant's participation in the beating of a prosecution witness was error requiring reversal (Docket No. 139303). The people appeal.

In an opinion by Justice RILEY, joined by Chief Justice BRICKLEY, and Justices BOYLE and MALLETT, the Supreme Court *held:*

None of the prosecutor's statements or actions rose to the level of error requiring reversal. The alleged evidentiary error does not warrant reversal even if it were found to be error.

1. The references by the prosecutor to the defendant's Arabic ethnicity, viewed in context, were innocuous, not intended to inflame the jury, and not of a degree that prejudiced the defendant's right to a fair trial.

2. The prosecutor did not improperly bolster the credibility of his witnesses by eliciting their promises to give truthful testimony or face prosecution and life imprisonment. Read in their entirety, the comments were fair, and were distinguishable from conduct previously held to require reversal.

3. The prosecutor, during closing argument, generally, did not improperly appeal to the fears and prejudices of the jury or express a personal opinion regarding a defendant's guilt that amounted to error requiring reversal. Nor, taken in context, did the prosecutor's remarks denigrate the defendant so as to require reversal.

4. The trial judge did not abuse his discretion in admitting evidence that a prosecution witness was beaten while the defendant was present in another room, because it was relevant

to the witness' motivation for cooperating with the government. In any event, its admission was harmless in light of other evidence demonstrating the defendant's participation in the conspiracy. Thus, the defendant was not deprived of a fair trial.

Reversed.

Justice LEVIN, joined by Justice CAVANAGH, dissenting, stated that the decision of the Court of Appeals reversing the defendant's conviction and remanding for a new trial should be affirmed. There was prosecutorial misconduct in proffering evidence that the defendant and other participants were Iraqis, in vouching for the credibility of other participants in the alleged conspiracy through questioning that they agreed to provide "truthful" testimony in exchange for charge and sentence concessions, by appealing to the jury's sense of civic responsibility, and by vouching for the strength of the prosecution's case. In addition, the trial judge erred in allowing the introduction of evidence that, sometime after the conspiracy had concluded, the defendant played a role in the beating of one of the witnesses.

Justice WEAVER took no part in the decision of this case.

202 Mich App 214; 508 NW2d 170 (1993) reversed.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *Richard Thompson,* Prosecuting Attorney, and *Robert C. Williams,* Assistant Prosecuting Attorney, for the people.

*Fried, Saperstein & Kriger, P.C.* (by *Steven R. Sonenberg*), for the defendant.

Amicus Curiae:

*Paul P. Asker* for the Chaldean-American Bar Association.

RILEY, J. In the instant case, we are asked to review three claims of prosecutorial misconduct and one claim of improperly admitted evidence. With respect to the first claim of prosecutorial misconduct, we must decide whether use of and reference to the terms "Arab," "Arab connection," and "Iraqi" at a trial conducted during the Per-

sian Gulf War deprived defendant of a fair trial. Reviewing the statements in context, including the other evidence admitted at trial, we conclude that the statements were innocuous, not intended to inflame the jury, and not of a degree that prejudiced defendant's right to a fair trial.

Second, we must decide whether the prosecutor improperly bolstered the credibility of his witnesses by eliciting their promises to give truthful testimony or face prosecution and life imprisonment. We conclude that this line of questioning was relevant and did not result in any improper bolstering of prosecution witnesses.

Third, we must decide whether the prosecutor appealed to the fears and prejudices of the jury by allegedly injecting a civic duty argument, expressing a personal opinion about defendant's guilt, and using denigrating terms to describe defendant. Again, we find no error requiring reversal. Reviewing the argument in its entirety, we are persuaded that it was based on evidence produced at trial, in part responding to argument by defense counsel, and accordingly did not appeal to the fears and prejudices of the jury. We also conclude that the claimed use of denigrating terms did not result in error requiring reversal.

Finally, turning to the alleged evidentiary error, we must determine whether the trial judge abused his discretion in admitting evidence that prosecution witness Salwan Asker was beaten while defendant was present in another room. We conclude that the trial judge did not abuse his discretion in admitting this evidence because it was relevant to Asker's motivation for cooperating with the government. In any event, admission of this evidence was harmless in light of other evidence demonstrating defendant's participation in this conspiracy. Thus, we are persuaded that defendant was

not deprived of a fair trial. Accordingly, we reverse the decision of the Court of Appeals and reinstate defendant's conviction.

I

Defendant Saad Bahoda was indicted by a grand jury for conspiracy to possess with intent to deliver and to deliver in excess of 650 grams of cocaine.[1] The indictment alleged a conspiracy beginning in January of 1985 and continuing until August, 1989. While nine individuals were named in the indictment, only defendant Bahoda and codefendant Basam Jarges were prosecuted in the instant trial.

The jury trial commenced on February 4, 1991, before Oakland Circuit Court Judge Richard D. Kuhn. On February 12, 1991, the jury found defendant guilty as charged. He was later sentenced to mandatory life in prison without parole.

Defendant appealed his conviction in the Court of Appeals. He claimed that he was denied a fair trial because of references to his Arabic ethnicity during the prosecutor's opening statement and during the questioning of prosecution witnesses Rene Arias, Wissam Abood, Salwan Asker, and Lawrence Awdish. Similarly, defendant claimed that the prosecutor improperly bolstered the credibility of two prosecution witnesses by eliciting testimony of an agreement that promised to send them to prison for life if they lied at trial. Likewise, defendant claimed error requiring reversal because the prosecutor resorted to a civic duty argument, improperly embellished the strength of his case to the effect that drug cases do not get any better than the instant case, and improperly

[1] MCL 750.157a; MSA 28.354(1); MCL 333.7401(2)(a)(i); MSA 14.15(7401)(2)(a)(i).

denigrated defendant. Finally, defendant maintained that it was irrelevant and prejudicial to admit evidence that prosecution witness Salwan Asker was beaten by Emanual Newman, after being driven to this location by defendant.

The Court of Appeals agreed with defendant, finding that "defendant was denied a fair trial, even if he did not object to every single instance of misconduct now complained of, because the cumulative prejudicial effect of the prosecutor's comments could not have been cured by an instruction." 202 Mich App 214, 216; 508 NW2d 170 (1993).[2] The Court also found error requiring reversal in the admission of evidence regarding defendant's participation in the beating of Salwan Asker because it tended to show that defendant was a bad person who deserved conviction.[3] *Id.* at 220.

We granted leave to appeal on May 6, 1994.[4]

II

We turn first to whether defendant was denied a fair trial by the use of Arabic and Iraqi references. Defendant reminds us that this jury trial occurred

---

[2] Specifically, the Court of Appeals held that all references to Arabic ethnicity were improper especially because the trial occurred during the Persian Gulf War, *id.* at 217; that the prosecutor improperly elicited testimony concerning his promise to send certain government witnesses to prison if they did not testify truthfully, *id.* at 218; and that the prosecutor improperly inflamed the jury about the drug problem and also improperly commented on the strength of the state's case, *id.* at 218-219. However, the panel did not specifically rule on defendant's claim that the prosecutor denigrated him, even though it was properly raised in the Court of Appeals.

[3] The Court also held that evidence of a secret compartment used for drug trafficking was relevant and its admission did not constitute an abuse of discretion. *Id.* at 220. This issue is not before us. Moreover, the Court did not reach defendant's claim that his sentence constituted cruel and unusual punishment because it was ordering a new trial in any event. *Id.* Again, this issue is not before us.

[4] 445 Mich 881.

during the third and fourth weeks of the Persian Gulf War and is relevant because defendant and many of the alleged coconspirators are Chaldean Iraqis.

### A

As with all forms of prosecutorial misconduct, this Court abhors the injection of racial or ethnic remarks into any trial because it may arouse the prejudice of jurors against a defendant and, hence, lead to a decision based on prejudice rather than on the guilt or innocence of the accused.[5] Therefore, this Court is not hesitant to reverse where potentially inflammatory references are intentionally injected, with no apparent justification except to arouse prejudice.[6] In reviewing such claims, this

---

[5] See, e.g., *Solomon v Stewart,* 184 Mich 506; 151 NW 716 (1915); *Nemet v Friedland,* 273 Mich 692; 263 NW 889 (1935). As explained in *Cluett v Rosenthal,* 100 Mich 193, 200; 58 NW 1009 (1894):

The courts are open to aliens and citizens alike; and any attempt, by arousing the prejudice of jurors, to curtail this right, is a departure from the proper privilege of counsel, and, when carried to the extent indicated by the language quoted, is sufficient to justify reversal of the case. It is unnecessary to cite cases decided by this Court in which the privilege of counsel in arguing cases has been considered. It is enough to say that the Court will not regard captious objections to arguments, and will allow something for the zeal of counsel, and will hesitate in any case to consider that counsel have intentionally transgressed the rule. But where the language is such as evinces a studied purpose to arouse the prejudice of the jury, based upon facts not in the case, we cannot overlook it, or consider that a party against whom such effort has been made has had a fair consideration of his case at the hands of the jury.

[6] See, e.g., *Nemet,* n 5 *supra* at 696-697; *People v Hill,* 258 Mich 79, 87-89; 241 NW 873 (1932) (reference to the defendant's race).

It is the duty of the public prosecutor to see that the person charged with crime receives a fair trial, so far as it is in his power to afford him one, and it is likewise his duty to use his best endeavor to convict persons guilty of crime; and in the discharge of this duty an active zeal is commendable, yet his

Court examines the remarks in context to determine whether they denied defendant a fair trial.[7] See *People v Allen,* 351 Mich 535; 88 NW2d 433 (1958).

> methods to procure conviction must be such as accord with the fair and impartial administration of justice . . . . [*People v Dane,* 59 Mich 550, 552; 26 NW 781 (1886).]

When an attempt is made to arouse ethnic prejudices, the rule of reversal appears universal:

> The primary requisites for . . . the reversal of a conviction . . . by reason of a prosecutor's statement, complained of as appealing to racial, national, or religious prejudice against the defendant or a defense witness, are that such statement must have been intended or have a tendency to engender such prejudice, that it must have been unjustified, and that the defendant was or may have been thereby deprived of his right to a fair and impartial trial. [70 ALR4th 664, § 2, p 671.]

[7] We agree with the following statement made in *People v Cowell,* 44 Mich App 623, 627-628; 205 NW2d 600 (1973):

> The question of the propriety of a prosecutor's remarks is dependent upon *all* the facts of the case. A statement cannot be taken out of context. Just as jury instructions must be read as a whole, so must the remarks of the prosecutor. The prosecutor's remarks must be evaluated in light of the relationship or lack of relationship they bear to the evidence admitted at trial. The fact that a statement has been reversible error in one case does not automatically mean that a similar remark is reversible error in another case. Each case must be considered on its own facts. For example, a remark found to constitute reversible error because it was not supported by the evidence would *not* be reversible error in a case where it was supported by the evidence. [Emphasis added.]

We note that many Court of Appeals decisions have reviewed prosecutorial misconduct in terms of whether "it was deliberately injected into the proceedings by the prosecution, if it deprived the defendant of a fundamental element of the adversary process or if it is of a particularly inflammatory or persuasive kind." See, e.g., *People v Furman,* 158 Mich App 302, 318; 404 NW2d 246 (1987); *People v Gallon,* 121 Mich App 183, 188-189; 328 NW2d 615 (1982); *People v Swan,* 56 Mich App 22, 32; 223 NW2d 346 (1974). Contrary to the dissent's suggestion, this test is not and never has been whether defendant is guilty regardless of the error. The test is simply whether the conduct rose to the level of denying defendant a fair trial.

B

Against this backdrop, we turn to defendant's specific claims of misconduct. At trial, several references were made to Arabic ethnicity,[8] the first occurring during the prosecutor's opening statement. In discussing the expected testimony of prosecution witness Salwan Asker, the prosecutor explained that Asker chose to cooperate with the government after he was arrested on immigration charges. In doing so, the prosecutor noted that "Mr. Asker will tell you he's an Iraqi native, as are many people in this crowd."[9] Defense counsel did not object, and thus no limiting instruction was given.

After opening statements, the prosecutor called Rene Arias. Arias informed the jury that he was a Cuban native who was testifying for the government under a plea arrangement subjecting him to fifteen years in prison rather than mandatory life. When referring to members of the drug conspiracy, Arias often referred to them either using ethnic or racial references. Specifically, Arias referred to one member as the "Argentina" or "Argentine," to others as the "Columbians [sic]," to one man as "black," and to defendant, Ray Akrawi, and Atheer Gappi as the "Arabs" or the "Arab connection."

Reacting to Arias' comments regarding ethnicity, the prosecutor occasionally used the same term to phrase a follow-up question. Generally,

[8] The prosecutor also referred to others in the organization as Colombians, who were in Florida, and to Rene Arias as "a Cuban, who came here during the Miriel [sic, Mariel] boat lift . . . ."

[9] Defense counsel, in his opening statement, explained that most of the prosecution witnesses were involved in a drug conspiracy and thus sought a deal to avoid mandatory life in prison. Without mentioning nationality, defense counsel noted that "[t]hese witnesses, many of them, if not all of them, faced deportation to countries that had repressive political regimes and where they faced fates that were arguably worse than mandatory life in prison without parole in an American jail."

however, defense attorneys objected to these Arabic references, resulting either in a rephrasing of the question[10] or simply being sustained by the trial judge.[11] After a few references to Arabic ethnicity, both the prosecutor and the trial judge admonished Arias. No such objection or admonishment was offered with respect to any other nationality, however.

On cross-examination, *defense counsel* immediately questioned Arias regarding his Cuban heritage and his arrival in this country by means of the Mariel boat lift. Defense counsel also questioned Arias regarding his immigration status and his possible deportation. At one point, Arias became frustrated with questions about his ethnicity and responded: "You told me before—you ask me

---

[10] *Q.* How much was each kilogram of cocaine costing, if you buy it in a 35 lump sum like that?

*A.* Well, to them, to the Arab connection, we give a different deal. All depend how much we pay ourselves.

*Q.* Okay. You said to the Arab connection, the deal would depend upon what you guys paid?

*A.* Yes.

*Mr. Procida [Jarges' counsel]*: And I'm going to object to reference to nationality at this point.

*Mr. Bunting [prosecutor]*: I have no objection. I was just using this for help.

*Q. (By Mr. Bunting, continuing)*: To these men, Ray, Saad and Atheer . . .

*A. (Interposing)*: Yes.

[11] *Q.* Then what happened?

*A.* Then Ray leave. Then next day, because I told them somebody with the car is coming up, because I don't want them to believe I was the one driving the car, because I don't want them to follow me, because I was dealing for these people for almost a month. I don't know. I don't know. I been listening a lot about Arabic, Chaldean, Iraqi, you know.

*Mr. Sonenberg [Defendant's counsel]*: Your Honor, I am going to object to any reference to nationality. I don't think that [it] is relevant.

*The Court:* The Court will sustain the objection. Try not to do that.

—you ask me before not to talk about Arabs, now you're talking about M[a]rielitas."

On redirect examination, more references emerged regarding Arabs. After one reference of note,[12] an objection ensued, followed by a discussion in the presence of the jury regarding the use of the term "Arabs." It was observed that the United States was fighting a war in the Middle East, not Colombia, and reference to the term "Arab" was not appropriate. After ordering the prosecutor to rephrase the question, the prosecutor stated:

> *Q.* Talk about the Columbians and everybody all you want, but we can't mention that "A" word, do you understand?
> *A.* I understand.
> *Q.* Okay. You were mad at the Columbians, and you were also mad at somebody else. Don't tell us their nationality or group, but why were you [mad] at them?

Subsequently, the prosecutor elicited references to the Iraqi nationality of several prosecution witnesses, including Wissam Abood, Salwan Asker, and Lawrence Awdish. In doing so, the prosecutor

---

[12] *Q.* You were mad at who [sic]?
*A.* To the Columbians [sic] and to the Arabs.
*Q.* Why were you mad at the Columbians?
*A.* Because they promised me a lot of things, you know, like if the deal we made before, if you got caught, we support your family, we support your lawyer, we support everything.
*Q.* Did they support your family?
*A.* They don't do nothing.
*Q.* Did they support your lawyer?
*A.* Nothing.
*Q.* And you were mad at who, the Arabs too?
*A.* Yes, I was mad to them . . . .

also inquired of these witnesses whether Detroit had a large Chaldean population. They answered in the affirmative, indicating that many Chaldeans left Iraq to avoid discrimination and religious persecution.

C

While it was unfortunate that this trial occurred during the Persian Gulf War, our review of the comments persuade us that they did not prejudice defendant by causing the jury to convict because of prejudice rather than the evidence. Unlike *Cluett v Rosenthal,* 100 Mich 193, 200; 58 NW 1009 (1894), we do not find a "studied purpose to arouse the prejudice of the jury . . . ." In *Rosenthal,* the comments were clearly intentional and designed to arouse prejudice against Jewish defendants. The plaintiff's counsel referred to the defendants as "[t]hese men of Jerusalem," suggesting that the defendants, like all Jews, were taking advantage of the plaintiff, and, in doing so, caricatured the speech and gestures of Jews. *Id.* at 199. Similarly, in *Nemet v Friedland,* 273 Mich 692, 696; 263 NW 889 (1935), this Court found error requiring reversal where the plaintiff's counsel commented that "I think this man, like the Jew Shylock, was after the last pound of flesh and last drop of blood." Finally, in *Solomon v Stewart,* 184 Mich 506, 511; 151 NW 716 (1915), defense counsel consistently made arguments that the transaction at issue was a "Jew deal."

We simply do not have the deliberate arousal of prejudice in this instance as was the case in *Rosenthal, Friedland,* and *Stewart.* We find this situation more akin to the facts in *People v Marji,* 180

Mich App 525, 538-541; 447 NW2d 835 (1989),[13] and *George v Travelers Indemnity Co*, 81 Mich App 106, 114-116; 265 NW2d 59 (1978).[14] In those cases, the questioning was improper and probably irrelevant, but did not rise to the level of error requiring reversal.

In the instant case, most of the comments were improper and possibly irrelevant.[15] Nonetheless, we find the comments, viewed in context, to be innocuous, unintended, and not of a degree that prejudiced defendant's right to a fair trial.[16] On these facts, where most of the prosecution witnesses were of Arab descent, we find it difficult to believe that the prosecutor deliberately injected ethnicity in an attempt to convince the jury to convict on the basis of prejudice or that the mere reference to Arabic ethnicity deprived defendant of a fair trial.

Simply because these references occurred during the Persian Gulf War does not mean that reversal is required. It must be remembered that we were fighting with, as well as against, those of Arabic heritage during the Persian Gulf War. Hence, prejudice by use of Arabic ethnicity does not automatically follow. In this case, we are persuaded

---

[13] In closing argument, the prosecutor stated:

This man comes from the Middle East, and he's not content to make his money from the gas station. He needs more. He gets into the cocaine, nontaxable income life-style. [*Id.* at 538.]

[14] On cross-examination, the prosecution questioned a witness concerning where "Chaldeans originated, the number of churches they attend, and the size and cohesiveness of the Detroit Chaldean community . . . ." *Id.* at 115.

[15] We do note, however, that defense counsel specifically attacked various prosecution witnesses for accepting plea arrangements with the government in order to avoid deportation. Accordingly, it may be relevant as a response to proofs raised or expected to be raised by the defense. See, e.g., *People v Duncan*, 402 Mich 1, 16; 260 NW2d 58 (1977) (opinion of RYAN, J.).

[16] Indeed, many comments were not objected to by defense counsel, thus eliminating the possibility of curative instruction.

that these comments were not deliberately injected by the prosecutor, but rather were responses by a witness who, because of his limited command of the English language, used this term to distinguish one group of purchasers from another. In this context, where references were frequently followed by admonishments by the prosecutor and trial judge, we are convinced that defendant received a fair trial.

Finally, the prosecutor's comment during his opening statement and the questioning of the ethnic heritage of various witnesses probably were improper. However, given that the names of these witnesses were obviously Arabic in origin and the defense theory was that many of these witnesses faced deportation if they did not seek a plea, we cannot find error requiring reversal. Read in its entirety, along with the other evidence against defendant,[17] we conclude at this point that defendant was not denied a fair trial because of the prosecutor's references to ethnicity.

III

Defendant's second claim of prosecutorial misconduct alleges improper bolstering of prosecution witnesses. The prosecutor is said to have improperly elicited the substance of either a plea arrangement[18] or other reward for testifying, including

---

[17] See part v for a full discussion of the evidence against defendant.

[18] *Q. [Redirect examination by the prosecutor]*: Now, obviously when you're discussing cocaine with Saad Bahoda here at the place over on Greenfield in Oakland County, there was nobody else around was there?

*A. [By Mr. Hadair]*: I don't believe so, no.

*Q.* If you wanted to come in and lie to this Jury, you could say, oh, yeah, I talked with Saad Bahoda at the Arcade and he delivered me five kilograms. You could say that, couldn't you?

*A.* I believe so I could.

*Q.* But that would be a lie?

*A.* Right.

"use immunity,"[19] in exchange for telling the truth

*Q.* You could say, yeah, he delivered me five kilograms multiple times. We did it over and over and over again, correct?

*A.* Um-hum.

*Q.* But you know what your agreement is, right?

*A.* Truthful testimony.

*Q.* What happens if you don't provide truthful testimony?

*A.* I get charged with life without parole.

*Q.* That's life, mandatory life in prison?

*A.* Yes.

*Q.* You could say that you dealt with Basam Jarges here, correct?

*A.* Yes.

*Q.* You could say that at the time when Harry Kalasho and the rest of you went to Jeff Weitzer's house, or whatever it is, that Basam Jarges was right there with an AK47, you could say that, couldn't you?

*A.* Yes, I could.

*Q.* But the only person you went with was Basil Mezy, Nick Konja, Sam the Bull, Harry Kalasho, right?

*A.* I think there was another individual—uhhh—uhhh—he's the same person that delivered the cocaine to me, the five kilos. I think he was present. If I see him I know him.

*Q.* But you could say something about Basam Jarges.

*A.* Yes, I could.

*Q.* If you wanted to, if we wanted you to lie, right?

*A.* Right.

*Q.* But you understand that wouldn't be truthful testimony?

*A.* Yes.

*Q.* What would happen if you lied?

*A.* I'd be facing life without parole, in Jackson.

---

[19] *Q.* [*Redirect examination by the prosecution*]: But, you understand what the situation is, don't you Mr. Asker?

*A.* Yes, sir.

*Q.* If you lie to this Jury what happens?

*A.* I go to jail for life, I have been promised by you.

*Q.* If you lie about the drug dealer, or any part of this organization you are going to be prosecuted, aren't you?

*A.* Yes, sir.

*Q.* You understand that?

*A.* Yes, sir.

*Mr. Sonenberg:* Your Honor, I object to this line of questioning.

*Mr. Bunting:* Your Honor, I think the implication from the Defense was that he was lying to save his skin. I think I am allowed to bring out the fact that if he lies now he loses his skin.

at defendant's trial. The prosecutor then reminded the jury of these agreements during closing argument.[20] A detective also testified concerning general police procedures that help verify statements made by informants. However, in doing so, he did not refer specifically to any government witness in this case.[21]

---

*The Court:* We can go on from there.

*Mr. Bunting:* Excuse, me?

*The Court:* I said the Court is going to allow the answer to stand, but ask him to go on.

*Mr. Bunting:* Yes, your Honor.

[20] The only thing I think you will recall, really, is the two things that we promised. One that Hadair would get relocated to a Federal Prison so he wouldn't get killed, and two, that if Asker ever lied we would put him in prison for the rest of his life. And that is all that come [sic] out of the Prosecutor in Oakland County.

[21] *Q.* [*By the prosecutor*]: So did you attempt to develop witnesses from inside the organization?

*A.* [*By Agent Palombella*]: Yes, sir, we did.

*Q.* And when you find a witness like that do you just swallow their story, hook, line and sinker?

*A.* No, sir, not at all.

*Q.* Well, what do you do?

*A.* Well, an attempt to verify what they say is—every attempt to verify what they say is made. And, as opposed to saying, for example, do you know this individual or do you know this individual, one approach might be that we know about the organization. Why don't you tell us what you know about it? Who reports to who? Who collects money? Who picks up and dropped off loads of dope? Who are the enforcement people? For example, if non-payment is made who is responsible for going out in the old vernacular breaking thumbs and following up to collect the money? And from each individual interview that we conduct, then we try to determine from our own knowledge about associations from surveillance and from other cooperating witnesses' testimony or information that they provide us, we try to come up more or less with a composite chart and see if there is any variation from what one informant might tell us to what another informant might tell us, maybe, our own observations. For example, if one person says one drug dealer never associates or deals with another one, for example, we may have a thirty-five millimeter (35 mm) photo or some video footage that shows, in fact, that they were at each other's house, we'll have to discount that aspect of it.

Included in the list of improper prosecutorial commentary or questioning is the maxim that the prosecutor cannot vouch for the credibility of his witnesses to the effect that he has some special knowledge concerning a witness' truthfulness.[22] See, e.g., *People v Enos,* 168 Mich App 490, 492; 425 NW2d 104 (1988). While this is generally improper, the simple

> reference to a plea agreement containing a promise of truthfulness is in *itself* [not] grounds for reversal. A more accurate statement of the law appears to be that, although such agreements should be admitted with great caution, admissibility of such an agreement is not necessarily error unless it is used by the prosecution to suggest that the government had some special knowledge, not known to the jury, that the witness was testifying truthfully.[23]

Generally, "[b]y calling a witness who testifies pursuant to an agreement requiring him to testify truthfully, the Government does not insinuate possession of information not heard by the jury and the prosecutor cannot be taken as having expressed his personal opinion on a witness' veracity." *United States v Creamer,* 555 F2d 612, 617-618 (CA 7, 1977).[24]

Reviewing the record in this light, we are per-

---

[22] See, generally, anno: *Use of plea bargain or grant of immunity as improper vouching for credibility of witness—state cases,* 58 ALR4th 1229; anno: *Propriety and prejudicial effect of comments by counsel vouching for credibility of witness—state cases,* 45 ALR4th 602; anno: *Propriety and prejudicial effect of prosecutor's argument to jury indicating that he has additional evidence of defendant's guilt which he did not deem necessary to present,* 90 ALR3d 646.

[23] *People v Buschard,* 109 Mich App 306, 316; 311 NW2d 759 (1981) (emphasis supplied), vacated and remanded 417 Mich 996; 334 NW2d 376 (1983), reaff'd on remand 129 Mich App 160, 165; 341 NW2d 260 (1983) ("Our reasons for finding no error were detailed at length in our first opinion . . . we decline to change our initial opinion").

[24] See also *United States v Ellis,* 547 F2d 863, 868-869 (CA 5, 1977); *United States v Koss,* 506 F2d 1103, 1112-1114 (CA 2, 1974); *United*

suaded that the comments and questions did not
rise to the level of error requiring reversal. The
questioning, as it relates to the entire trial,[25] was
proper and did not convey a message to the jury
that the prosecutor had some special knowledge or
facts indicating the witness' truthfulness.[26] See,
e.g., *People v Williams,* 123 Mich App 752, 755-
756; 333 NW2d 577 (1983).[27]

---

*States v Hedman,* 630 F2d 1184, 1198-1199 (CA 7, 1980). For cases
finding conduct to be error requiring reversal, see, e.g., *United States
v Bess,* 593 F2d 749, 753-757 (CA 6, 1979); *United States v Roberts,*
618 F2d 530, 535-537 (CA 9, 1980).

[25] See n 7.

[26] We find the conduct in the instant case markedly different than
conduct found violative in other cases in which the prosecutor put the
prestige of the office behind a personal belief of a witness' truthful-
ness. For example, in *People v Quick,* 58 Mich 321, 324; 25 NW 302
(1885), the prosecutor stated:

> "I stand here to-day under the solemnity of my official oath,
> and say to you, as a man and a citizen, that I believe they not
> only lied, but I believe they committed willful and deliberate
> perjury. I do not believe that they were there that night, nor do
> I believe that that man, the defendant, ever in God's world took
> that watch from the sidewalk, but he stole it from the person of
> David Wright, and then hid it away within five minutes."

This Court reversed, holding that

> [t]his language came from an officer whose sworn duty required
> him to act only in furtherance of justice, and who is bound by
> statutory requirements to stand entirely impartial between the
> complainant and the prisoner. When such an officer gives the
> jury to understand that what he says is under the sanction of
> his official oath, and the court, when applied to, declines to
> correct that statement, it cannot be supposed that jurors may
> not give credence to it and govern their decision more or less
> by it.

[27] In *Williams,* a key prosecution witness was asked the following:

> "*Q.* And you and your attorney entered into a plea agree-
> ment, is that correct?
> "*A.* That's correct.
> "*Q.* Part of that agreement was that you would tell the
> truth, is that correct?
> "*A.* Yes, that is correct.

Although defendant questions whether the contents of the plea arrangement or rewards were admissible absent a request by the defense,[28] given the entire circumstances of this case, including cross-examination of defense attorneys, "we cannot

> "*Q*. And that if you did so and you completely testified, you would be allowed to plead to a charge of manslaughter or unarmed robbery, is that correct?" [*Id.* at 755.]

No objection was made. In rebuttal closing argument, the prosecutor further stated the following:

> "You know, he agreed to tell the truth and the truth was he did have that shotgun for a while, did have it and he exchanged, like he said, because Harold Williams had told him he was going to kill them and that is the gun that he was going to use to kill them and that he would handle it, and it would be just like shooting a pheasant or another animal, it wouldn't bother him.
>
> "So if Jeffrey Pippins is not telling you the truth and making up this story, I guess he is not a very good story maker, or he at least could have made up another one, because, as I stated to you, the only way we got Mr. Pippins here to testify as to the statement. You heard no other evidence other than after he gave us a statement." [*Id.* at 756.]

The Court found no error because the prosecution simply disclosed the promises made to obtain the witness' testimony. *Id.* at 755. In closing, "[t]he prosecutor's rebuttal argument referred to the promise of truthfulness contained in the plea agreement, but the prosecutor did not suggest that he had some special knowledge, unknown to the jury, that Pippins was testifying truthfully." *Id.* at 756. The instant case is very similar, save the fact that defense counsel objected to Asker's testimony. Nonetheless, these similarities and our independent review of the facts in the case at bar persuade us to find no error requiring reversal.

[28] *People v Atkins,* 397 Mich 163, 173; 243 NW2d 292 (1976):

> Where an accomplice or co-conspirator has been granted immunity or other leniency to secure his testimony, it is incumbent upon the prosecutor and the trial judge, if the fact comes to the court's attention, to disclose such fact to the jury upon request of defense counsel. The same requirement of disclosure should also be applicable if reasonable expectations, as opposed to promises, of leniency or other rewards for testifying resulted from contact with the prosecutor.

say that they were fatally prejudicial or entirely without provocation."[29] *Allen, supra* at 544.

With respect to witness Hadair, aside from some initial questioning concerning the basics of the plea arrangement,[30] which defense counsel immediately began questioning about on cross-examination, the alleged bolstering occurred on redirect examination.[31] There, the prosecutor was attempt-

---

[29] See also *People v George*, 375 Mich 262, 265; 134 NW2d 222 (1965); *People v Green*, 34 Mich App 149, 151; 190 NW2d 686 (1971).

[30] *Q.* Okay. So did you go ahead and sell the kilo to the police officer?

*A.* Yes, I did and I got arrested.

*Q.* Did you get charged in Macomb County?

*A.* Yes.

*Q.* And what were you charged with?

*A.* I was charged with many charges. Two of them carried a life felony.

*Q.* Okay. What were the charges with the life felony?

*A.* Conspiracy to deliver over 650 grams cocaine.

*Q.* Well, did you get convicted on that offense?

*A.* I plead guilty to a lesser charge.

*Q.* Did you make an agreement with somebody?

*A.* Yes, I did.

*Q.* Macomb County Prosecutor's Office?

*A.* It was Macomb County, Oakland County and I believe the DA are involved in it.

*Q.* The DEA?

*A.* Yes.

*Q.* What did the Macomb County charge get reduced to?

*A.* They agreed if I give a truthful testimony that my charges will be dropped to less than 650 grams of cocaine, and over 225 grams of cocaine and I was sentenced to 12 to 30 years in prison.

*Q.* Twelve to thirty?

*A.* Yes.

*Q.* Now, are you going to serve that time in the State Prison or Federal Prison?

*A.* I was promised by Oakland County Prosecutor Office and the Federal Government—Federal Prosecutor Officer [sic], that I would serve my time in the Federal facility.

*Q.* Is that for your safety?

*A.* Yes.

[31] On direct examination, it was simply a reference to the plea

ing to respond to impeachment questioning regard-
ing a prior hearing at which Hadair named sev-
eral coconspirators but failed to mention any deal-
ings or discussions with defendant. While proper
impeachment does not invite improper bolstering,
after reviewing it in context, and given its brevity,
we are persuaded that it did not convey any
special knowledge.[32] We construe this questioning
simply as an attempt to rehabilitate a prosecution
witness.[33]

Likewise, the prosecutor's redirect examination
of Asker was brief and in response to vigorous
cross-examination that had the effect of showing
that Asker was lying to keep himself from being
deported or going to prison, or because of his drug
addiction.[34] On the basis of these facts, we do not
deem this questioning error requiring reversal
because the questioning was brief, was on redirect
examination,[35] and was in response to questioning
that arguably required some attempt at rehabilita-

___

arrangement and could not have conveyed any message that the
prosecutor had special knowledge.

[32] The dissent fails to recognize that the test for improper bolstering
requires analysis whether the questioning conveyed any special
knowledge. It is not a matter of "lip service" regarding attendant
legal doctrines.

[33] See *Ellis,* n 24 *supra* at 869 ("the statement was fairly in reply to
the comments made by defense counsel").

[34] In addition, we note that the judge specifically instructed the jury
to carefully consider the weight of Asker's testimony because he was
a drug addict testifying for the prosecution.

[35] Unlike the instant case, the questioning in *People v Rosales,* 160
Mich App 304, 310; 408 NW2d 140 (1987), and *Enos, supra* at 492-493,
occurred during direct examination and could not properly be charac-
terized as a response to defense arguments. Moreover, in *Enos,* the
prosecutor recalled a witness because he had lied on cross-examina-
tion and then threatened to void the plea arrangement because of it.
The prosecutor further discussed this on cross-examination. We find
*Rosales* distinguishable because there were numerous other errors
that assisted in a finding of improper vouching that contributed to the
cumulative error requiring reversal.

tion.[36] Moreover, in this case, the questioning was objected to and was allowed to stand, with the judge admonishing the prosecutor to move on to a different line of questioning. Viewed in its entirety, we conclude that it was not error.

We also find the comments during closing argument brief and not improper bolstering of prosecution witnesses. There was no objection to the closing argument. Read in their entirety, the comments were fair and distinguishable from conduct found to require reversal in other cases.[37] Assuming there was some impropriety in this argument, the judge's instruction that arguments of attorneys are not evidence dispelled any prejudice.[38]

Finally, we are persuaded that the testimony of Agent Palombella likewise did not result in improper bolstering. While he testified regarding police procedures used to verify the events occurring in any criminal organization, he did not

---

[36] See *People v Savant*, 112 Mich 297, 300; 70 NW 576 (1897); *People v DeCamp*, 146 Mich 533, 535; 109 NW 1047 (1906); *People v West*, 146 Mich 537, 539; 109 NW 1041 (1906). See also *Allen, supra* at 544.

[37] For example, in *People v Erb*, 48 Mich App 622, 631; 211 NW2d 51 (1973), the prosecutor stated:

> "[I]f I thought a witness would come into court and testify under oath a falsity of any kind, he would never be called as a witness in behalf of the people, never. It is my duty to present the truth and I expect the witnesses that I call to present the truth, and his testimony is that there is no question that the defendant is the man."

Similar comments are not present in the case at bar.

[38] See *Ellis*, n 24 *supra* at 869. In the instant case, the judge stated:

> The lawyers' statements and arguments are not evidence. They are only meant to help you understand the evidence and each side's legal theories. The lawyers' questions to witnesses are also not evidence. You should consider these questions only as they give meaning to the witnesses' answers. You should only accept things the lawyers say that are supported by the evidence or by your own common sense and general knowledge.

relate it specifically to this case. Unlike *People v Smith*,[39] nothing in his testimony indicated that he believed the prosecution witnesses testified truthfully or that the stories of specific witnesses were verified. Finally, any impermissible inference flowing from his testimony did not amount to error requiring reversal in this six-day jury trial.

IV

Defendant's final claim of prosecutorial misconduct asserts prejudicial error stemming from the prosecutor's closing argument. Defendant maintains the prosecutor resorted to a "civic duty" argument about the "drug problem" in society, thus appealing to the fears and prejudices of jury members. He also contends that the prosecutor expressed personal opinions about defendant's guilt by improperly referring to the strength of his case and denigrating defendant on evidence not produced at trial.

Generally, "[p]rosecutors are accorded great latitude regarding their arguments and conduct." *People v Rohn*, 98 Mich App 593, 596; 296 NW2d 315 (1980), citing *People v Duncan*, 402 Mich 1; 260 NW2d 58 (1977). They are "free to argue the evidence and all reasonable inferences from the evidence as it relates to [their] theory of the case." *People v Gonzalez*, 178 Mich App 526, 535; 444 NW2d 228 (1989). See also *People v Bigge*, 297 Mich 58, 68; 297 NW 70 (1941). Nevertheless, prosecutors should not resort to civic duty arguments that appeal to the fears and prejudices of jury members[40] or express their personal opinions

---

[39] 158 Mich App 220, 230-231; 405 NW2d 156 (1987).

[40] *People v Williams*, 65 Mich App 753, 755-756; 238 NW2d 186 (1975).

of a defendant's guilt,[41] and must refrain from
denigrating a defendant with intemperate and
prejudicial remarks.[42] Such comments during clos-
ing argument will be reviewed in context to deter-
mine whether they constitute error requiring re-
versal.[43]

### A. CIVIC DUTY

Specifically, defendant claims that the pros-
ecutor made an improper civic duty argument to
the jury by referring to the size of the drug
problem,[44] the pervasive nature of this drug organ-
ization,[45] the amount and value of the drugs seized
during the arrest,[46] and the unique locations at

---

[41] *Bigge, supra* at 68.

[42] See, e.g., *People v Fredericks*, 125 Mich App 114,·118-119; 335
NW2d 919 (1983). See also anno: *Negative characterization or descrip-
tion of defendant, by prosecutor during summation of criminal trial,
as ground for reversal, new trial, or mistrial—modern cases,* 88
ALR4th 8.

[43] See n 7.

[44] Hassad Adar [sic] also testified. He started dealing in '87. He
bought cocaine from Hakim Zakar and Sam, the Bull. He
bought ounces and quarter kilos, and kilos. Just another dope
dealer we have here. This whole world—you'd think when you
go home, that this whole world is full of dope dealers. But don't
think that way. It's not. It's just that we get them all in this
trial because we're working with one of the biggest organiza-
tion[s] that you can ever imagine.

[45] It's so pervasive. It's so pervasive in this organization. But
they go out and they talk about this stuff like it's—like it's you
and I talking about selling ice cream. Or buying gasoline at the
market. But Habood [sic] talks with Harry Kalasho. Kalasho
asks him, "Do you need anything? Do you need anything? If
you do, here's a number. You use this beeper number. This is
Ray's number. He'll get back with you."

[46] Mr. Arias got involved in selling and working large scale
cocaine deals with the Columbians, he was caught. He was
caught red-handed, as they say. With ninety-nine (99) kilo-
grams of cocaine. It was stacked up in front of you just about
as tall as I am. That's two hundred and twenty (220) pounds of
cocaine. That's nine thousand nine hundred (9,900) grams of

which some of these drug transactions occurred.[47]

·While there are numerous claims of misconduct, we are persuaded that all these references constituted permissible commentary on evidence admitted at trial. References to the size of the drug organization, the amount and value of the drugs, and locations at which some of these transactions occurred were all "reasonable inferences from the evidence as it relates to his theory of the case." *Gonzalez, supra* at 535. Simply because some drug deals occurred at a public pool or bakery, i.e., evidence admitted at trial, does not make commentary about it impermissible. On these facts, we are persuaded that the prosecutor was not "injecting issues broader than the guilt or innocence of the accused under the controlling law," but was rather asking the jury to convict on the basis of evidence

pure uncut rock solid, hard cocaine. You heard the people talk about it. When they take cocaine and sell it out to the street people, to the people using it, that use it—what's the word they use, socially—when they use it socially—they take the cocaine and cut it, double its bulk and sell it for sixty-eight (68) to a hundred dollars ($100) a gram. You can do the math better than I. That was enough cocaine there to retire the debt of half the Third World countries in the world—in the world. . . . [T]hat's more money than all of us together will earn in our lifetime probably.

[47] You heard from Wassam Habood [sic]. He had dealings with Harry Kalasho at the swimming pool on Thirteen Mile Road. I · don't know if any of you are from the south end of the county and I don't care to know. But, doesn't it just amaze you the people who are dealing multi-, multi-million dollars of cocaine —multi-kilograms of cocaine. They're dealing with four Nationals and, you know, these Columbians and buying and selling cocaine. Go to a swimming pool to discuss this stuff. How much do you think of this happens when you're out at the swimming pool? Just boggles your mind, doesn't it? Boggles mine.

\* \* \*

Both days he went to the Croissant Shop. I can just picture this and so can you when you go back there. These guys go in there to buy coffee and have a roll and discuss half a million dollars worth of Cocaine over a fifty (50) cent Danish.

produced at trial. Accordingly, we do not discern any improper attempt to appeal to the fears and prejudices of jury members.

Moreover, we note that defense counsel failed to object.[48] We believe that if defense counsel perceived any impropriety, he should have objected and sought an appropriate instruction. In any event, we agree that the conduct certainly did not rise to the level of error requiring reversal.

### B. PERSONAL OPINIONS

Defendant also claims that the prosecutor committed prejudicial error by injecting personal opinion regarding the strength of his case.[49] Reviewing

---

[48] In *Duncan, supra,* Justice RYAN, writing for a plurality, refused to reverse on the basis of unobjected to commentary regarding how heroin is destroying our society and our children:

> The discussion of the narcotics evidence in final argument was intemperate and ill-advised even though the prosecutor himself, at another point in his argument, informed the jury of the limited uses of the evidence. In this instance as well, however, defense counsel failed to object and request a curative instruction. We agree with the Court of Appeals that the prejudicial propensity of this brief but improper reference to narcotics could have been cured by a prompt objection and curative instruction. We therefore decline to reverse on this point, although the reference to the similar acts evidence in the final argument is expressly disapproved. [*Id.* at 18.]

[49] [Y]ou will never see another situation quite this clear for the rest of your life if you were on forty (40) Jurys [sic].

This is in front of you, it is in black and white moving pictures and it doesn't get any better than that.

\* \* \*

Electronic wonders are wonders. They don't always work. It was too bad that the Agents always can't get things to work out a hundred percent (100%). My goodness what do you want? What do they want? We got dope behind the table, we got dope on the table. Ninety-nine (99) kilograms that the Cuban said he was delivering to the Arabs.

A hundred twenty grams (120) grams that the Agents have and you see a buy on, identification of the people, the man on video tape, the man in the pictures turning packages over to

these isolated comments in context, we find no error requiring reversal.[50]

We conclude that these comments were intended to rebut the defense theory that this was a "bought" case, i.e., that government witnesses were granted some type of favor in exchange for their testimony against defendant, or that the government witnesses were simply liars. While using the prestige of the prosecutor's office to inject personal opinion is improper,[51] the rebuttal nature of these comments did not amount to error requiring reversal.[52] There was a substantial amount of evidence against defendant. The prosecutor simply commented on the effect and strength of this evidence, albeit some of the com-

---

the Columbians. The man on the video take [sic] taking packages from the Columbians. What more can you possibly expect law enforcement to do to prove the case to you.

*  *  *

This wasn't a bought case, this was a perfect case, this was a perfect case. These dope cases don't get any better.

*  *  *

The case is presented to you well wrapped up, well organized, that's as good as it is going to get.

[50] Cf. *People v McCoy*, 392 Mich 231, 239-240; 220 NW2d 456 (1974), finding that the following comments combined with other trial errors denied defendant a fair trial:

"[T]he Detroit Police Department, the detectives in the Homicide Bureau, these detectives you see in court today, and myself from the Prosecutor's Office, we don't bring cases unless we're sure, unless we're positive. So the Defendant, Mr. McCoy, was let go at that time because the evidence wasn't enough to be positive. That's why he was arrested a month later because a month later the evidence was positive."

[51] See, e.g., *Dane,* n 6 *supra* at 552; *Cowell,* n 7 *supra* at 628.

[52] See *Duncan, supra* at 16-17 ("Certain of the latter remarks, although if standing alone could be seen as improper, do not constitute reversible error in this case because of their responsive nature, and because any unduly prejudicial effect could have been eliminated by a curative instruction if one had been requested upon a timely objection." Citations omitted.).

ments may have been ill-advised. On the record before us, we do not believe the jury suspended its power of judgment in favor of the "wisdom" or "belief" of the prosecutor's office.[53]

In the instant case, the prosecutor was merely responding to defense claims that the prosecutor had presented a bought case. These comments were so innocuous that it did not cause a timely objection.[54] Moreover, the evidence presented was not so even-sided that it could be deemed a "credibility contest." Indeed, the defendant did not even present a case. We are persuaded that, even if the prosecutor's statements were improper, they did not rise to the level of error requiring reversal.

---

[53] Arguably, the conduct in *People v Welch,* 80 Mich 616, 618; 45 NW 482 (1890), constituted a more definite and prejudicial statement of personal opinion, but did not result in error requiring reversal:

> "I stand here representing the people of this State, of whom the defendant is one. I do not believe in partisanship in the trial of a criminal cause, nor in the exhibition of passion or feeling. It should have no place here. If I were capable of scattering among you flowers of eloquence with never so lavish a hand, I should not do it. It may seem extreme, but as I felt that the defendant should not be convicted of any offense greater than manslaughter, and with my associate have so advised the court, and asked an instruction to that effect; so, if I believed the defendant was not guilty of the crime of manslaughter, or if I had a reasonable doubt of his guilt of that offense, I would not stand before you, and ask you to convict him."

In response, this Court noted that defense counsel objected, but held: "It does not strike us that the remark could or did have any prejudicial influence with the jury, and no request was made to the court to guard the jury against such influence. We therefore overrule this exception." *Id.* at 622. Indeed, the Court considered this statement in the context of other evidence admitted at trial, which was substantial.

[54] We note that defense counsel moved for a mistrial following the prosecutor's rebuttal, arguing that it was improper to state "that this is a perfect case and it doesn't get any better." The trial judge immediately denied the motion. Certainly there are times when it is better not to object and draw attention to an improper comment. This may be one of those situations. Even so, our review of the record on its merits persuades us that it is not error requiring reversal.

### C. DENIGRATING DEFENDANT

Following the contention that the prosecutor improperly expressed personal opinions about defendant's guilt is the claim that the prosecutor improperly denigrated defendant. Defendant contends that the prosecutor referred to defendant and his associates as "thieves, like the thieves and the sharks that they are," when in fact there were no allegations or evidence of theft. See, e.g., *People v Fredericks*, 125 Mich App 114, 118; 335 NW2d 919 (1983). We disagree.

Defendant takes the comment out of context. The prosecutor was explaining what occurred after the organization's leader died.[55] Indeed, the comment was directed at members of the organization generally, not simply defendant. Given the isolated nature of this comment in this lengthy record and its explanatory purpose, we certainly would not find error requiring reversal, and we so hold.[56]

V

Finally, we turn to the question whether the trial judge abused his discretion in admitting evidence regarding defendant's involvement in the beating of prosecution witness Salwan Asker.

Generally, evidence that is relevant will be ad-

---

[55] The crime charges from January of '85 to August of '89. Not June of 1990. See in June of 1990 the organization had been gone. Harry was dead. As Asker told you they were fighting at each other's throats like thieves, like the thieves and the sharks that they are. And nobody can get a deal together because everybody wanted to be Harry. Everybody is reaching for the top. Nobody will follow orders, nobody does anything right any more. Harry Kalasho was dead. He may have been a lot of things, but at least he could make that organization run. These people can't get it together any more.

[56] Also, defense counsel did not object to this comment.

missible. MRE 401 defines relevant evidence as
evidence that has "any tendency to make the
existence of any fact that is of consequence to the
determination of the action more probable or less
probable than it would be without the evidence."
However, relevant evidence "may be excluded if
its probative value is substantially outweighed by
the danger of unfair prejudice, confusion of the
issues, or misleading the jury, or by considerations
of undue delay, waste of time, or needless presen-
tation of cumulative evidence." MRE 403. The
trial judge in the present case followed this proce-
dure when deciding to admit this evidence on the
basis that Asker's motivation for testifying was at
issue.

When reviewing evidentiary decisions under
MRE 401 and 403, our review is limited to
whether the decision was an abuse of discretion.[57]
In doing so, we are mindful that

> close questions arising from the trial judge's exer-
> cise of discretion on matters concerning the admis-
> sion of evidence do not call for appellate reversal
> because the reviewing justices would have ruled
> differently. Reversal is warranted only if the reso-
> lution of the question by the trial court amounted
> to an abuse of discretion. The decision upon a close
> evidentiary question by definition ordinarily can-
> not be an abuse of discretion. [*People v Golocho-
> wicz*, 413 Mich 298, 322; 319 NW2d 518 (1982).]

---

[57] As explained in *Spalding v Spalding*, 355 Mich 382, 384-385; 94
NW2d 810 (1959),

> The term discretion itself involves the idea of choice, of an
> exercise of the will, of a determination made between compet-
> ing considerations. In order to have an "abuse" in reaching
> such determination, the result must be so palpably and grossly
> violative of fact and logic that it evidences not the exercise of
> will but perversity of will, not the exercise of judgment but
> defiance thereof, not the exercise of reason but rather of
> passion or bias.

On the record before us, we do not discern such an abuse of discretion. While Asker's beating occurred after the conspiracy charged in the indictment, the evidence was relevant to demonstrate Asker's motivation for testifying and cooperating with the authorities.[58] We are persuaded, as was the trial judge, that the credibility of Mr. Asker, a key prosecution witness, was clearly at issue in this case. This evidence was probative of Salwan Asker's explanation for cooperating with the authorities, while also touching on his credibility. Indeed, it directly refuted the defense inference that Asker was lying and only testifying in order to avoid prosecution, deportation, or simply to get help with his drug addiction.

While it may be argued that the evidence portrayed defendant as a "bad person"[59] even though defendant did not participate in the beating,[60]

[58] The prosecutor explained:

No, it is not irrelevant, your Honor, this is a part of the organization, Bahoda is an integral part of the organization. Bahoda sets him up to get his in the vernacular, his butt beat, and, you know, he gets beaten very badly. That's part of the motivation in addition to saving his life to testify. These people are after me to get me.

[59] We note, however, that the prosecutor offered to withdraw the evidence if defense counsel agreed not to attack Asker's credibility or motivation for testifying. Of course, the prosecutor's offer required the judge to balance the defendant's right to cross-examine a witness against the prosecutor's right to rehabilitate the witness. Accepting its initial relevance, the judge ruled it admissible:

I can only say that the Court is not going to change it's [sic] ruling, unless Counsel wants me to indicate to the Prosecutor he shouldn't use it at first and then wait until you get through and then he is just going to come back after you have challenged his credibility and it is going to come in then. So, I think we might as well get on with it.

[60] However, defendant did drive Asker to the location where he was assaulted by Newman. On cross-examination, Asker said that he held defendant responsible for his beating.

given the relevancy of the testimony, the trial
judge's contemporaneous assessment of its effect
on the jury, and defendant's failure to request a
limiting instruction,[61] we are persuaded that the
trial judge did not abuse his discretion in admit-
ting the testimony. As the United States Court of
Appeals for the Third Circuit explained in *United
States v Long,* 574 F2d 761, 767 (CA 3, 1978): "If
judicial self-restraint is ever desirable, it is when a
Rule 403 analysis of a trial court is reviewed by an
appellate tribunal." We follow this wisdom, realiz-
ing that "Rule 403 determinations are best left to
a contemporaneous assessment of the presentation,
credibility, and effect of testimony" by the trial
judge. *People v VanderVliet,* 444 Mich 52, 81; 508
NW2d 114 (1993).

Assuming, however, that admission of the testi-
mony was error, we deem it harmless in light of
other evidence demonstrating defendant's partici-
pation in the conspiracy.[62] Several witnesses testi-
fied about defendant's direct involvement in this
drug conspiracy, including coconspirators Asker,
Arias, Hadair, Abood, and Awdish. On one occa-

---

[61] MRE 105 provides:

> When evidence which is admissible as to one party or for one
> purpose but not admissible as to another party or for another
> purpose is admitted, the court, upon request, shall restrict the
> evidence to its proper scope and instruct the jury accordingly.

In this case, the evidence was admissible to show Asker's motivation
for testifying and to rebut the inference that he was lying for his own
personal benefit. However, it was not admissible as bad character
evidence. Realizing this, defense counsel should have sought a limit-
ing instruction, but did not. In this situation, we cannot find error
requiring reversal. See *People v VanderVliet,* 444 Mich 52, 75; 508
NW2d 114 (1993).

[62] We also note that there was a videotape of a coconspirator
accepting a package of cocaine. Although defendant was not depicted
in the video, it is still admissible against defendant because he was
charged with conspiracy. When proof of an agreement is shown, other
evidence against a coconspirator becomes evidence against defendant.

sion, Special Agent James Helverson observed a narcotics transaction between Larry Awdish and defendant. Moreover, there was evidence from several witnesses that defendant possessed a beeper for use in drug transactions. There was also evidence that defendant's car contained a secret compartment used for hiding narcotics or a small gun. Finally, there was evidence that defendant fled after the indictment was issued, at which time he traveled under an assumed name and changed his physical appearance. Given the totality of this evidence, we find that any error in admitting Asker's testimony regarding the beating was harmless.[63]

VI

Our review of the three claims of prosecutorial misconduct persuade us that none of the prosecutor's statements or actions rose to the level of error requiring reversal.[64] This was a high stakes,

[63] Defendant also argues that it was error requiring reversal to admit the hex-shaped stick used in the beating. Even if this was error, we likewise find it harmless in light of the other evidence admitted against defendant.

[64] The Court of Appeals also held that the cumulative effect of errors denied defendant a fair trial. We disagree. In making this determination, only actual errors are aggregated to determine their cumulative effect. *United States v Rivera,* 900 F2d 1462, 1471 (CA 10, 1990) (en banc) ("Impact alone, not traceable to error, cannot form the basis for reversal"). In this case, the only conduct possibly found to be improper was the ethnicity references and the prosecutor's isolated injection of personal opinion in closing argument and the arguable denigration of defendant. We found no impropriety regarding claims of improper bolstering, use of a civic duty argument, or with the admission of testimony with respect to the beating of Salwan Asker. Hence, the latter will not be considered in the cumulative-error analysis.

The three actual errors all were based on claims of prosecutorial misconduct. Although the cumulative effect of these types of errors is not subject to any fixed considerations, relevant factors include the extent to which the remarks may have misled the jury and prejudiced defendant, whether they were isolated or extensive, whether they

hard fought case, vigorously contested by able advocates. Given that reality, it is inevitable that the record will not be pristine. It does not follow that the trial was not fair. Accordingly, the decision of the Court of Appeals is reversed and defendant's conviction and sentence are reinstated.

BRICKLEY, C.J., and BOYLE and MALLETT, JJ., concurred with RILEY, J.

LEVIN, J. (*dissenting*). Saad Bahoda was convicted of conspiracy with intent to deliver more than 650 grams of cocaine, and was sentenced to the mandatory term of life imprisonment without parole.

I would affirm the decision of the Court of Appeals[1] reversing Bahoda's conviction and remanding for a new trial because of prosecutorial misconduct

- in proffering evidence that Bahoda and other participants were Iraqis,
- in vouching for the credibility of other participants in the alleged conspiracy through questioning that they agreed to provide "truthful" testimony in exchange for charge and sentence concessions,
- by appealing to the jury's sense of civic responsibility,

---

were deliberately or accidentally injected, and the strength of other evidence against defendant. *Davis v Zant*, 36 F3d 1538, 1549 (CA 11, 1994). Reviewed in this light, we are not persuaded that the cumulative effect of these errors in this six-day jury trial warrants a new trial. Although frequent, the ethnicity references were not deliberately injected, did not mislead the jury, and, in the context of other evidence, did not prejudice defendant. The personal ·opinions and claims of denigration were isolated and, combined with the ethnic references, do not rise to the level of error requiring reversal. Defendant is only entitled to a fair trial, not a perfect one. He received a fair trial.

[1] 202 Mich App 214; 508 NW2d 170 (1993).

• by vouching for the strength of his case.

I also agree with the Court of Appeals that the trial judge erred in allowing the introduction of evidence that, sometime after the conspiracy had concluded, Bahoda played a role in the beating of one of the witnesses.

I would additionally address the constitutionality of the mandatory sentence of life imprisonment without the possibility of parole, which this Court declined to address in *People v Fluker*, 442 Mich 891; 498 NW2d 431 (1993).[2]

I

Early during the prosecutor's examination of the first witness, Rene Arias, a lawyer representing the codefendant tried with Bahoda, objected "to reference to nationality at this point" when the prosecutor said, "You said to the Arab connection . . . ." The prosecutor indicated that he would desist.

Soon thereafter during the direct examination, Arias said "I been listening a lot about Arabic, Chaldean, Iraqi." Bahoda's lawyer objected to any reference to nationality. The court sustained the objection with the admonition: "Try not to do that." But soon thereafter there was another reference by the witness to the "Arab connection," and twice more before the exchange set forth in the margin occurred.[3]

---

[2] My reasons are set forth in a dissenting statement in *Fluker*, 442 Mich 892-893, in which Chief Justice CAVANAGH joined.

[3]   *Q.* You were mad at who?
    *A.* To the Columbians [sic, Colombians] and to the Arabs.

                * * *

  *Q.* And you were mad at who, the Arabs too?
  *A.* Yes, I was mad to them . . .

While the failure ·of Bahoda's lawyer to object more persistently[4] might be thought by some to justify ignoring what occurred, the prosecutor's flip admonition to the witness—avoid the "A word"— and his failure thereafter to himself obey that admonition to the witness—when he, the prosecutor, on a number of occasions, thereafter inter-

> *Mr. Sonenberg* (*interposing*): I'm going to object in reference to nationality.
>
> *Mr. Bunting:* Well, he didn't object when he said Columbians, your Honor. I don't know what the problem is when he . . .
>
> *Mr. Sonenberg* (*interposing*):, Well, you know, we're not—we haven't sent our men over to Columbia to fight a major war, your Honor.
>
> *Mr. Bunting:* Well, we're fighting beside Arabs over there, too. It's not like we're all fighting all Arabs. There's Arab people that are in the Coalition.
>
> *Mr. Sonenberg:* I just don't think it has any place in this trial, Judge.
>
> *Mr. Bunting: Okay. We'll go along.*
>
> *The Court:* Rephrase.
>
> *Q.* (*By Mr. Bunting, continuing*): Talk about the Columbians and everybody all you want, *but we can't mention that "A" word, do you understand?*
>
> *A.* I understand.
>
> *Q.* Okay. You were mad at the Columbians, and you were also mad at somebody else. Don't tell us their nationality or group, but why were you made [sic] at them?
>
> *A.* I was mad at them because, thanks to them, we got caught.
>
> *Q.* Okay. [Emphasis added.]

[4] The prosecutor opened and closed with ethnic references. In his opening statement, he declared that Salwan Asker, one of the witnesses for the prosecution, "will tell you he's an *Iraqi* native, as are many people in this crowd." In his closing argument, the prosecutor referred to "[n]inety-nine (99) kilograms that the Cuban said he was delivering to the *Arabs."*

During the trial, there were frequent references to the ethnicity of witnesses, Bahoda and his codefendant. Rene Arias testified that cocaine "was going to [Bahoda]," and that "[t]his one was for the Arab connection." Again, *question:* "You hadn't talked to [Bahoda] but one time in 1988, and this is June of '88, and where do you say these 99 kilos were supposed to go, the ones that came from New York by semi-truck?" *Answer:* "To the Arabic connection." And again, *question:* "Did you tell them about Saad [Bahoda] and Atheer?" *Answer:* "I told the Arab connection, yes, I do."

jected "ethnicity"[5]—lead me to conclude that this was not inadvertent, and that it cannot be excused.

If the prosecutor had spoken of the Irish, or the Jewish, or the Italian, or the German connection, we might be more sensitive in our reactions. There should be zero tolerance of ethnic references, and a heavy burden should be imposed on the prosecutor to justify any such reference. If, as here, the prosecutor fails to sustain such burden, a new trial should be ordered without requiring the defendant to show prejudice. Such references without justification should be regarded as so offensive to the maintenance of a sound judicial process that reversal and remand for a new trial should ordinarily follow as a matter of course.

After every wave of immigration, the Irish to the east coast, the Germans to the Midwest, the Jews and Italians, demagogues—politicians, religious and political—and some prosecutors have sought to exploit prejudice against newcomers.

Similar waves of immigration of African Americans from the South during and following World War II, of Vietnamese and Koreans in more recent years, and of Hispanics to the southwest, have been exploited by the unprincipled. Now, it is the immigration of Iraqis, Chaldeans, Muslims, and other Arabs to Dearborn and other Michigan cities where some of the largest American Arabic communities have formed.

One need not have lived in Boston in the late nineteenth century, or in Minnesota during World War I, or in the major cities where Jewish and Italian immigrants congregated, to know that there was prejudice against the Irish, Germans, Jews and Italians. One does not have to be a

_____

[5] See ns 15, 17, and 21.

Korean or Vietnamese to know about the preju-
dice against them, or an African American to
know about the prejudice against them, or an
Iraqi, Chaldean, Muslim or Arab to understand
that there is prejudice against them.

That Bahoda was an Iraqi was irrelevant and
immaterial. When it was first mentioned, his law-
yer remained silent. But as the references to eth-
nicity became more frequent, he objected. The
prosecutor defended the references to Bahoda's
ethnicity. Then, instead of adhering to the court's
rulings barring such references, as he said he
would, he unabashedly returned to the ethnic
theme.[6]

The American Bar Association Standards pro-
vide respecting the prosecution function:

(a) The prosecutor may argue all reasonable
inferences from evidence in the record. It is unpro-
fessional conduct for the prosecutor intentionally
to misstate the evidence or mislead the jury as to
the inferences it may draw.

(b) It is unprofessional conduct for the pros-
ecutor to express his or her personal belief or
opinion as to the truth or falsity of any testimony
or evidence or the guilt of the defendant.[7]

---

[6] See ns 15, 17 and 21.

[7] The following appears in the commentary:

Personal Belief
Expressions of personal opinion by the prosecutor are a form
of unsworn, unchecked testimony and tend to exploit the
influence of the prosecutor's office and undermine the objective
detachment that should separate a lawyer from the cause being
argued. Such argument is expressly forbidden by the Code of
Professional Responsibility, and many courts have recognized
the impropriety of such statements. This kind of argument is
easily avoided by insisting that lawyers restrict themselves to
statements such as "The evidence shows . . ." or something
similar.
The line between permissible and impermissible argument is
a thin one. Neither advocate may express personal opinion as

(c) The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.[8]

(d) The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.

(e) It is the responsibility of the court to ensure that final argument to the jury is kept within proper, accepted bounds.[9]

The Court of Appeals, in reversing Bahoda's conviction, sent the correct message to the bench and bar: What occurred at Bahoda's trial will not be tolerated—at least where it is combined with other prosecutorial misconduct:

to the justice of his or her cause or the veracity of witnesses. Credibility is to be determined solely by the triers, but an advocate may point to the fact that circumstances or independent witnesses give support to one witness or cast doubt on another. The prohibition pertains to the advocate's personally endorsing, vouching for, or giving an opinion. The cause should turn on the evidence, not on the standing of the advocate, and the testimony of witnesses must stand on its own.

[8] The following appears in the commentary:

Appeals to Passion or Prejudice
Arguments that rely on racial, religious, ethnic, political, economic, or other prejudices of the jurors introduce into the trial elements of irrelevance and irrationality that cannot be tolerated. Of course, the mere mention of the status of the accused as shown by the record may not be improper if it has a legitimate bearing on some issue in the case, such as identification by race. But where the jury's predisposition against some particular segment of society is exploited to stigmatize the accused or the accused's witnesses, such argument clearly trespasses the bounds of reasonable inference or fair comment on the evidence. Accordingly, many courts have denounced such appeals to prejudice as inconsistent with the requirement that the defendant be judged solely on the evidence.

[9] Standard 3-5.8.

It is possible that the prejudice resulting from
some of the errors below could have been cured by
a timely instruction. In the aggregate, however,
and in light of the timing of the trial and of the
credibility disputes involved, these errors undoubt-
edly deprived defendant of a fair trial. Given the
mandatory life sentence without parole, we cannot
reward the prosecutor's improper attempt to ob-
tain conviction at any cost.[10]

A self-respecting judiciary would not allow, and
lawyers would know, that such conduct will not be
allowed.

A majority informs the profession today that
where it appears to a majority of this Court that
the defendant is guilty, well-established standards
designed to assure all accused persons a fair trial
will not be enforced.

II

Bahoda was charged, with eight other persons,
with conspiring to possess with intent to deliver,[11]
and to deliver,[12] in excess of 650 grams of cocaine.
The charges were part of a crackdown against the
remnants of the Kalasho drug dealing organization
in the Detroit metropolitan area. The members of
the Kalasho organization were alleged to have
conspired to buy and sell large quantities of co-
caine, between January, 1985, and August, 1989.

A number of drug dealers testified pursuant to
agreements with the prosecutor for charge and
sentence concessions. Rene Arias testified that he
had repeated dealings with Bahoda, Ray Akrawi

[10] 202 Mich App 220.
[11] MCL 750.157a; MSA 28.354(1).
[12] MCL 333.7401(2)(a)(i); MSA 14.15(7401)(2)(a)(i).

and Atheer Gappi, involving kilos of cocaine.[13] Arias detailed cocaine deliveries to Bahoda and others beginning in late 1986 or early 1987 through January, 1988.

Hassan Haidar testified that he talked to Bahoda about purchasing a kilo of cocaine, but the transaction was not concluded.[14] Wissam Abood testified that he arranged to purchase cocaine from Ray Akrawi in 1988.[15] Abood said that Bahoda was driving the automobile in which Akrawi was a passenger at the time of the first delivery. Abood said that he observed Bahoda driving the automobile on three other occasions when he purchased drugs from Akrawi.[16]

Salwan Asker,[17] an early participant in the Ka-

[13] Arias was arrested on June 28, 1988, by federal agents while driving his pickup truck containing 99 kilos of cocaine. He pleaded guilty in federal court, agreeing to testify on behalf of the government, and received a reduced sentenced of fifteen years.

[14] Haidar acknowledged that he did not see Bahoda buy or sell cocaine or handle proceeds from cocaine sales, and that he did not mention Bahoda when he testified at a related court proceeding in July 1990. On redirect examination, the prosecutor reminded Haidar that he was under obligation to provide "truthful testimony" as part of his agreement with the government.

[15] The prosecutor began the direct examination of Abood with questions regarding Abood's Chaldean/Iraqi heritage and the reasons why he immigrated to the United States.

[16] At the time of Bahoda's trial, Abood was facing charges in Macomb County for delivering over 650 grams of cocaine. Abood stated that he was not testifying pursuant to an agreement with the prosecution, although he faced a possible sentence of mandatory life imprisonment.

[17] The prosecutor began his direct examination by asking Asker where he was born, and questioning him about the Chaldean community in the Detroit area. Counsel for both Bahoda and the codefendant objected to the questioning in the following colloquy:

> *Q.* In fact, in the Detroit area it is one of the largest Chaldean . . .
> *Mr. Procida:* Objection.
> *Mr. Sonenberg:* Your Honor, I have an objection, I don't understand this line of questioning and I think it is irrelevant.
> *Mr. Bunting:* I don't think it is irrelevant, your Honor, I think it a reason why he didn't want to go back.

lasho organization, testified that Bahoda worked with Akrawi. Asker said that he and Bahoda delivered drugs on a number of occasions. Asker discussed a road trip with Bahoda to collect money owed to the drug organization. Asker also provided, over objection, testimony regarding an incident during which Bahoda drove him to meet another drug dealer, Emanuel Newman. Newman beat Asker with a stick containing numerous hexhead screws while Bahoda was in an adjacent room.[18] Bahoda then drove Asker to the home of Asker's uncle. Asker said that he ultimately decided to cooperate with the government because of threats made to him and his family after the beating.[19]

> *The Court:* I think you put the reason on—he put the reason on the record.

[18] Bahoda's lawyer objected to the admission of testimony regarding Asker's beating by Newman on the grounds that the evidence was prejudicial and irrelevant. The beating occurred after the alleged conspiracy concluded. There was no evidence that Bahoda participated in the actual beating. The prosecutor stated that he intended to offer this evidence to refute any attempt by the defense to challenge Asker's credibility. He argued that evidence regarding the beating was relevant to the reason why Asker decided to cooperate with the government and to show Bahoda's participation in drug dealing.

[19] Asker said that he was testifying under agreement with the government for which he received immunity. In the following exchange, on redirect examination, the prosecutor reminded Asker of his promise to testify truthfully as part of the agreement:

> *Q.* If you lie to this Jury what happens?
> *A.* I go to jail for life, *I have been promised by you.*
> *Q.* If you lie about the drug dealer, or any part of this organization you are going to be prosecuted, aren't you?
> *A.* Yes, sir.
> *Q.* You understand that?
> *A.* Yes, sir.
> *Mr. Sonenberg:* Your Honor, I object to this line of questioning.
> *Mr. Bunting:* Your Honor, I think the implication from the Defense was that he was lying to save his skin. I think I am allowed to bring out the fact that if he lies now he looses [sic] his skin.

Direct evidence of drug dealing was presented in testimony regarding an aborted undercover attempt to buy cocaine from Ray Akrawi, with Bahoda present, in November 1988 by a special agent of the Drug Enforcement Administration and an informant. This transaction fell through when Akrawi and Bahoda recognized Hayes' car as one seized from another drug dealer who had been arrested.[20]

Witnesses testified concerning a controlled purchase on February 1, 1989, that was arranged between Larry Awdish,[21] Awdish's cousin, Duraid Karim, Atheer Gappi, and Bahoda. Awdish and Karim communicated with Bahoda to purchase one-eighth of a kilo of cocaine (approximately four and one-half ounces) in Southfield. At the agreed location, Karim entered another automobile, paid $3,000 and received an aluminum foil ball containing cocaine from Bahoda.[22]

---

*The Court:* We can go on from there.

*Mr. Bunting:* Excuse me?

*The Court:* I said the Court is going to allow the answer to stand, but ask him to go on.

*Mr. Bunting:* Yes, your Honor. [Emphasis added.]

[20] DEA agents engaged in surveillance of the informant's house, but were unable to produce a good recording of the transaction.

[21] Awdish was questioned by the prosecutor regarding his birthplace (Iraq). Awdish had been arrested by the Western Wayne Narcotics Task Force in Wayne County in May 1987 for possessing over 650 grams of cocaine. Awdish participated in several controlled purchases for which he received a reduced state sentence. He then started working for the DEA in early 1989 when he participated in the controlled purchase. He stated that he had tried to set up several controlled purchases with Bahoda previously, but they did not go through. Awdish was originally sentenced to ten years by the federal court. As a result of his cooperation, the sentence was reduced to six months. While on supervised release, Awdish was required to continue cooperating with the government.

[22] Awdish testified that, although the transaction lasted approximately ten minutes, he saw Bahoda's face for about five seconds. A police officer testified that he was conducting surveillance of the transaction from across a busy street. Although he did not see Bahoda

In his closing argument, the prosecutor reviewed the testimony of the witnesses and the evidence. The prosecutor commented on the amount of money that was involved.[23] He referred to the locations where the members of the Kalasho organization arranged their drug deals, and commented on the pervasiveness of drugs.[24] The prosecutor commented during rebuttal on the strength of the evidence he had presented.[25] Following the

during the transaction, he identified Bahoda as a passenger when he pulled up next to the automobile about one block away from the buy site. Awdish and Karim were equipped with devices to make sound recordings of the transaction. The devices did not work; nor was there video surveillance.

[23] He stated:

> You can do the math better than I. That was enough cocaine there to retire the debt of half the Third World countries in the world—in the world. There is a lot of cocaine there. Think it through. Nine thousand nine hundred (9,900) doubled times a hundred (100). That's more money—I don't know what your jobs are—but that's more money than all of us together will earn in our lifetime probably.

[24] The prosecutor said,

> I don't know if any of you are from the south end of the county and I don't care to know. But, doesn't it just amaze you the people who are dealing multi-, multi-million dollars of cocaine—multi-kilograms of cocaine. They're dealing with four Nationals and, you know, these Columbians and buying and selling cocaine. Go to a swimming pool to discuss this stuff. How much do you think of this happens when you're out at the swimming pool? Just boggles your mind, doesn't it? Boggles mine.
>
> It's so pervasive. It's so pervasive in this organization. But they go out and they talk about this stuff like it's—like it's you and I talking about selling ice cream. Or buying gasoline at the market.

[25] The prosecutor said:

> Well, there is the surveillance, there's the delivery, sometimes these cases seem too good, and they have to argue about something I guess.

\* \* \*

conclusion of the rebuttal, Bahoda's counsel moved
for a mistrial based on the prosecutor's comments.

### III

The gist of the majority's opinion is that none of
the errors urged by Bahoda are sufficient to war-
rant reversal. The majority concludes, "This was a
high stakes, hard fought case, vigorously contested
by able advocates. Given that reality, it is inevita-
ble that the record will not be pristine. It does not
follow that the trial was not fair."[26] The majority
touches upon but does not engage in harmless-
error analysis. Nor does the majority consider the
cumulative prejudicial effect of what occurred at
the trial.[27] The majority separately addresses each
of Bahoda's claims, and avoids considering the
larger, more fundamental question whether Ba-
hoda received a fair trial.[28]

### IV

The prosecutor's improper references to Baho-
da's Arab ethnicity are most objectionable. The

> This wasn't a bought case, this was a perfect case, this was a
> perfect case. These dope cases don't get any better.
>
> * * *
>
> This case is presented to you well wrapped up, well orga-
> nized, that's as good as it is going to get.

[26] *Ante,* pp 292-293.

[27] See *People v McCoy,* 392 Mich 231, 240; 220 NW2d 231 (1974);
*People v Bairefoot,* 117 Mich App 225, 232; 323 NW2d 302 (1982);
*People v Green,* 74 Mich App 601, 607; 254 NW2d 788 (1977).

[28] Most of the evidence regarding Bahoda's involvement in the
alleged conspiracy came from witnesses testifying pursuant to agree-
ments with the prosecution. The only other evidence of Bahoda's drug
dealing came from the testimony of the DEA agents and another
witness who was testifying as a government informant. While such
testimony may not be inherently unreliable, in the absence of any
objective evidence of guilt, such as photographs, video or audio
recordings, issues of credibility were central to the prosecution's case.

prosecutor during his opening statement referred to the Iraqi background of one of the witnesses, as well as Iraqi spectators; permitted references to, and himself referred to, the "Arab connection"; questioned witnesses concerning their Chaldean background and the Chaldean community; and referred to "the Arabs" in his closing argument.

While the majority expresses disapproval of the ethnic references,[29] and states that most of the comments were "improper and possibly irrelevant,"[30] the majority nevertheless concludes that the comments "did not prejudice defendant by causing the jury to convict because of prejudice rather than the evidence."[31] The majority ignores that the trial occurred during this country's involvement in the Gulf War.[32]

The majority also concludes that the comments were not deliberately injected into the proceedings by the prosecution. While I agree that a number of the references to Arabs may not have been deliberate, the prosecutor deliberately—long after he agreed to refrain from commenting on ethnicity—asked witnesses their birthplaces and inquired concerning the nature and size of the Chaldean community in the Detroit area.[33]

---

[29] *Ante,* pp 266-267.

[30] *Ante,* p 272.

[31] *Ante,* p 271.

[32] The majority argues that "[i]t must be remembered that we were fighting with, as well as against, those of Arabic heritage during the Persian Gulf War. Hence, prejudice by use of Arab ethnicity does not automatically follow." *Ante,* p 272. The argument ignores the hostility of the rhetoric and emotions aroused in this country toward Iraqis, non-Iraqis of Arab descent, and even persons who do not regard themselves as Arabic, during the Gulf War.

[33] The majority notes that Bahoda's lawyer did not object to each Arab or Iraqi reference, thereby preventing the trial court from issuing a curative instruction. *Ante,* p 272, n 16. The record shows that Bahoda's lawyer objected to a number of the references. These objections were sufficient to put the prosecutor and the trial court on notice that these comments were objectionable.

When the prosecution interjects issues beyond the defendant's guilt or innocence, the defendant's right to a fair trial may be jeopardized.[34] This is particularly true of ethnic allusions.[35]

V

The prosecutor erred when he bolstered the testimony of Asker[36] and Haidar.[37] Both witnesses were testifying pursuant to charge and sentence plea agreements that had been arranged with the prosecution. The prosecutor elicited testimony on redirect examination that each witness had agreed to testify truthfully and would be sent to prison for life if he lied.

The prosecutor elicited testimony from a police investigator that he had verified the stories of both witnesses. The Court of Appeals found that this testimony suggested to the jury that the prosecutor had special knowledge of the truth of the witnesses' testimony.[38]

Although a prosecutor has a duty to disclose the

[34] *People v Rohn*, 98 Mich App 593; 296 NW2d 315 (1980); *George v Travelers Indemnity Co*, 81 Mich App 106; 265 NW2d 59 (1978).

[35] See, e.g., *Nemet v Friedland*, 273 Mich 692, 697; 263 NW 889 (1935); *George*, n 34 *supra*.

In *George*, a civil case, the defendant insurance company sought to introduce irrelevant evidence regarding the Chaldean background of the claimant. *Id.* at 114. The Court declined to reverse because the plaintiff failed to object and request a curative instruction and because the questioning was not so prejudicial as to deny a fair trial, considering all the evidence. *Id.* at 115-116. Nevertheless, the Court observed that "[c]ounsel who indulge in such argument always bear the risk that unnecessary prejudice will, in the right case, overwhelm an otherwise proper presentation of relevant evidence." *Id.* at 116, n 4.

In the instant case, Bahoda's lawyer adequately registered his objections to the ethnic allusions and questioning.

[36] See n 19.

[37] See n 14.

[38] 202 Mich App 217-218.

terms of a plea agreement,[39] he may not vouch for the credibility of a witness.[40]

Asker was asked on redirect examination, "if you lie to this Jury what happens?" He responded, "I go to jail for life, *I have been promised by you.*"[41] (Emphasis added.) Asker thus made explicit what was implicit in the prosecutor's belaboring that the charge and sentence concessions were in exchange for truthful testimony.[42]

It is well established that a lawyer trying a case for a party may not testify at the trial, and that, again, the prosecutor may not personally vouch for the truth of the testimony he offers. The prosecutor in this case crossed both lines. The United States Court of Appeals for the Ninth Circuit observed:

> A strong case can be made for excluding a plea agreement promise of truthfulness. The witness, who may otherwise seem untrustworthy, may appear to have been compelled by the prosecutor's threats and promises to come forward and be truthful. The suggestion is that the prosecutor is forcing the truth from his witness and the unspoken message is that the prosecutor knows what the truth is and is assuring its revelation.[43]

The in-exchange-for-truthful-testimony incantation is Orwellian. The prosecutor decides what is

---

[39] *People v Atkins,* 397 Mich 163; 243 NW2d 292 (1976).

[40] *People v Enos,* 168 Mich App 490, 492; 425 NW2d 104 (1988); *People v Rosales,* 160 Mich App 304, 311; 408 NW2d 140 (1987); *People v Buschard,* 109 Mich App 306, 316; 311 NW2d 759 (1981), vacated and remanded 417 Mich 996; 334 NW2d 376 (1983), reaff'd on remand 129 Mich App 160; 341 NW2d 260 (1983).

[41] See n 19.

[42] The parallel questioning and responses of Haidar, and Asker's statement, "I have been promised by you," suggest that both witnesses may have been schooled in their responses by the prosecutor.

[43] *United States v Roberts,* 618 F2d 530, 536 (CA 9, 1980).

truthful testimony,[44] and the witness has no practical opportunity for judicial review. The witness knows the testimony he must provide to obtain the benefit of the bargain he made with the prosecutor. These witnesses, facing life imprisonment without parole, knew that the prosecutor, if dissatisfied with their testimony, had the power to make them run the gauntlet, and fully understood what the prosecutor meant by truthful testimony. But the jury, unless instructed by the court concerning that esoteric meaning of truthful testimony, might be misled by prosecutorial repetition of the in-exchange-for-truthful testimony incantation.

The majority dismisses Bahoda's argument that the prosecutor's questions to Asker and Haidar were error.[45] The majority concludes that the prosecutor was merely attempting on redirect examination to rehabilitate these witnesses.[46]

The majority notes that the redirect questioning of Asker was in response to vigorous cross-examination by defense counsel regarding Asker's motive to lie. The majority states, "On the basis of these facts, we do not deem this questioning error requiring reversal because the questioning was brief, was on redirect examination, and was in response to questioning that arguably required some attempt at rehabilitation."[47] That the questioning occurred on redirect examination does not justify what otherwise would be inadmissible.

While the testimony of the investigator may have been general,[48] I agree with the Court of Appeals that the questioning was improper because it suggested that the authorities had taken

---

[44] See n 14.

[45] *Ante,* pp 279-281.

[46] *Id.,* pp 280-281.

[47] *Id.*

[48] *Id.,* pp 281-282.

special steps to assure that witnesses were telling the truth, and was tantamount to an expression of opinion by the police/prosecutor regarding the truthfulness of the witnesses.[49]

VI

The prosecutor argued that the street value of the cocaine could "retire the debt of half the Third World countries," and was more than most of the jurors together could expect to earn in their lifetimes. The prosecutor observed that some of the allegedly conspiratorial activities took place at a community swimming pool in Oakland County. The prosecutor commented on the size and pervasiveness of the drug problem.

As the majority notes, a prosecutor is accorded much latitude in constructing his arguments,[50] and is free to comment on the evidence and the inferences to be drawn from the evidence.[51] A prosecutor may not, however, argue issues broader than the defendant's guilt or innocence without infringing on the defendant's right to a fair trial.[52] Prosecutors are not permitted to appeal to the juror's sense of "civic duty."[53]

In *People v McCoy*, 392 Mich 231, 239-240; 220 NW2d 456 (1974), this Court criticized the prosecutor's rebuttal summation that his office did not "bring cases unless we're sure, unless we're posi-

[49] See *People v Smith*, 158 Mich App 220, 231; 405 NW2d 156 (1987).

[50] *People v Duncan*, 402 Mich 1; 260 NW2d 58 (1977); *People v Rohn*, n 34 *supra*, p 596.

[51] *People v Marji*, 180 Mich App 525, 538; 447 NW2d 835 (1989).

[52] *Rohn*, n 34 *supra*, p 596.

[53] *Id.*, pp 596-597; *People v Biondo*, 76 Mich App 155, 158; 256 NW2d 60 (1977); *People v Meir*, 67 Mich App 534, 537-538; 241 NW2d 280 (1976); *People v Williams*, 65 Mich App 753, 755-756; 238 NW2d 186 (1975) (citing *People v Farrar*, 36 Mich App 294; 193 NW2d 363 [1971]).

tive." The Court said that "it is not permissible for the prosecutor to vouch for the defendant's guilt on his own knowledge or on the knowledge of police officers who did not testify."[54]

The prosecutor in the instant case assured the jury that the evidence "doesn't get any better," and was almost "too good," and that the case was "perfect" and "well organized [and] that's as good as it is going to get." The majority characterizes these comments as "isolated,"[55] and "innocuous."[56] The majority states that the comments were intended to rebut defense counsel's theory that this was a "bought" case. Implicit in the majority's reasoning is the notion that the prosecutor should be permitted special leeway in responding on rebuttal. Such a view is unsupported by case law.[57]

## VII

I also agree with the Court of Appeals that it

[54] Such arguments have also been criticized by the Court of Appeals. In *People v Smith*, 158 Mich App 220, 231; 405 NW2d 156 (1987), citing *People v Fuqua*, 146 Mich App 250, 254; 379 NW2d 442 (1985), the Court said, "A prosecutor may argue the credibility of the witnesses and the guilt of the defendant, but may not support the argument with the authority or prestige of the prosecutor's office or the prosecutor's personal knowledge." In *People v Humphreys*, 24 Mich App 411, 418; 180 NW2d 328 (1970), the Court of Appeals held that a remark in the prosecutor's rebuttal argument was improper because it encouraged the jury "to suspend its own powers of critical analysis and judgment in deference to those of the police and the prosecutor." The Court ruled similarly in other cases prosecutorial comments on the guilt of the defendant and the strength of the evidence. See *People v Erb*, 48 Mich App 622, 631-632; 211 NW2d 51 (1973); *People v Tarpley*, 41 Mich App 227, 237; 199 NW2d 839 (1972).

[55] *Ante,* p 288.

[56] *Ante,* p 287.

[57] Without analysis, the majority dismisses defendant's motion for mistrial, commenting that the prosecutor's remarks did not cause a timely objection. See n 30. The majority incredibly concludes that this was not a credibility contest.

The majority dismisses Bahoda's claim that the prosecutor denigrated him in closing. The Court of Appeals did not address this issue.

was error to admit evidence regarding the beating of Asker after the conclusion of the alleged con- spiracy.[58] It is not claimed that Bahoda partici- pated in the beating. The Court of Appeals con- cluded that the evidence was irrelevant and preju- dicial because it was designed only to show that Bahoda was a person deserving of conviction.[59]

The majority finds no abuse of discretion in the admission of the evidence, concluding that it was admissible because Asker's credibility was in issue and the evidence was probative of Asker's motive for cooperating with the authorities. Assuming that Asker's motive was relevant, the evidence that he had been beaten shortly before he decided to cooperate with the authorities could have been admitted without Asker's testimony that Bahoda had driven him to and from the site of the beating, and was in an adjoining room during the beating. The evidence that Bahoda had driven Asker served no relevant purpose, and portrayed Bahoda as a duplicitous and dishonorable enforcer.[60]

CAVANAGH, J., concurred with LEVIN, J.

WEAVER, J., took no part in the decision of this case.

---

[58] This evidence was objected to by Bahoda's lawyer. See n 18.

[59] 202 Mich App 220.

[60] The majority does not engage in harmless-error analysis, but conclusorily asserts that, even if there was error, it was harmless in light of the other evidence presented. *Ante,* p 291. While there was ample evidence of Bahoda's participation, the source of that evidence was the testimony of witnesses whose credibility was suspect. In the absence of other more objective evidence, I do not understand how the majority can conclude that the evidence of the beating was harmless.