# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

BRYAN MILANO,

      Defendant-Appellant.

UNPUBLISHED
April 21, 2015

No. 318782
Wayne Circuit Court
LC No. 12-009181-02-FH

---

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

JEFFERY HILL,

      Defendant-Appellant.

No. 318897
Wayne Circuit Court
LC No. 12-009181-04-FH

---

Before: TALBOT, C.J., and MURPHY and GLEICHER, JJ.

PER CURIAM.

A jury acquitted defendants Bryan Milano and Jeffrey Hill, former Wayne County Sheriff deputies, of assault charges stemming from the beating of a county jail inmate. The jury convicted both, however, of misconduct in office, MCL 750.505, false report of a felony, MCL 750.411a(1)(b), and conspiracy to commit misconduct in office, MCL 750.505; MCL 750.157a. Defendants raise several challenges in these consolidated appeals to the prosecutor's conduct, admission of a codefendant's prior bad acts, sufficiency of the evidence, and the jury instructions. None of the alleged errors warrant relief and we affirm.

## I. BACKGROUND

On January 25, 2010, Wayne County Jail inmate, DeShawn Bragg, was severely beaten in his cell. Four Wayne County Sheriff deputies were in or near the cell when the beating occurred: Matthew Czarnecki and Allan Oliver, who were convicted by a jury of committing the assault, and the current defendants, who were acquitted for the actual assault but were convicted

-1-

for their role in the cover-up. Trial evidence tended to establish that Deputy Czarnecki had held a two-year grudge against Bragg and created an opportunity to extract his revenge. Four deputies wearing black gloves entered Bragg's cell. While Bragg alleged that all four deputies participated in the physical attack, the jury's verdict suggests that they believed Milano and Hill blocked Bragg's escape or acted as look-outs, and lied about the event after the fact.

Czarnecki accused Bragg of instigating a struggle when the deputy entered to complete necessary processing paperwork. Czarnecki asserted that Oliver arrived first on the scene and helped subdue Bragg, with Milano arriving second and placing the inmate in handcuffs. Hill reported that he witnessed the incident from the guard station and sent Milano and Oliver to assist. According to Hill, Milano sent out a coded distress call to the jail's other guards before running to Bragg's cell. Despite their allegation that Bragg instigated the attack, the only injury suffered by any deputy was a ripped uniform patch. Bragg's two cell mates provided a different version of events. One testified that four deputies entered the cell and attacked Bragg. He placed Hill at the scene, but did not identify Milano until trial. The other testified that Czarnecki instructed him to face the wall; therefore, he heard rather than saw the attack.

All four deputies were tried together before a single jury but with the assistance of separate attorneys. The jury convicted Czarnecki and Oliver of assault as well as misconduct in office and convicted Milano and Hill of only the lesser misconduct charges.

## II. UNANIMOUS VERDICT

Milano contends that he was deprived of his right to a unanimous jury verdict. Specifically, he notes that the misconduct in office and conspiracy charges were premised on two separate theories: (1) the assault or (2) the subsequent cover-up. Because the trial court did not instruct the jury that they needed to agree on the theory underlying the conviction, there is no certainty that the jury's verdict was unanimous, Milano complains.

Milano failed to preserve this issue by challenging the relevant instructions on this ground or by requesting a specific unanimity instruction. See *People v Gonzalez*, 256 Mich App 212, 225; 663 NW2d 499 (2003); *People v Gadomski*, 232 Mich App 24, 29-30; 592 NW2d 75 (1998). Our review is therefore limited to plain error. *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004).

A criminal defendant has a right under Const 1963, art 1, § 14 to a unanimous jury verdict. To protect that right, a trial court must properly instruct a jury regarding the unanimity requirement. *People v Cooks*, 446 Mich 503, 511; 521 NW2d 275 (1994). Here, the court instructed the jury on the elements of "common law misconduct in office or malfeasance the doing of a wrongful act" and of conspiracy to commit that common-law offense. The court instructed the jury that to support the convictions, the jurors must find that that defendant "either committed an act which in itself is wrongful" (referring to the assault) or "committed a lawful act in a wrongful manner" (referring to the false reports following the assault). The court subsequently read a general unanimity instruction to the jury, relevant to all the charges raised.

It is undisputed that a common-law misconduct in office charge against a law enforcement officer as defined may be based on alternate theories of "(1) malfeasance,

committing a wrongful act, or (2) misfeasance, performing a lawful act in a wrongful manner, or (3) nonfeasance, failing to do an act required by the duties of the office." *People v Milton*, 257 Mich App 467, 470-471; 668 NW2d 387 (2003). The question raised on appeal is whether a trial court bears a heightened duty to inform the jury that it must unanimously agree on the theory underlying offenses comprised of different theories. As recently discussed by this Court:

> Michigan law provides criminal defendants the right to a unanimous jury verdict. MCR 6.410(B). "In order to protect a defendant's right to a unanimous verdict, it is the duty of the trial court to properly instruct the jury regarding the unanimity requirement." [*Cooks*, 446 Mich at 511.] Often, the trial court fulfills that duty by providing the jury with a general instruction on unanimity. *Id.* at 512. However, a specific unanimity instruction may be required in cases in which "more than one act is presented as evidence of the actus reus of a single criminal offense" and each act is established through materially distinguishable evidence that would lead to juror confusion. *Id.* at 512-513. [*People v Chelmicki*, 305 Mich App 58, 67-68; 850 NW2d 612 (2014).]

In *Chelmicki*, the defendant was charged with unlawful imprisonment, "which expressly provides alternative theories under which a defendant may be convicted. The alternative theories each relate to a single element of the offense, and are merely different ways of establishing that element." *Id.* at 68. This description holds true of the misconduct in office offense and related conspiracy charge in the current case. In such cases, this Court concluded, a defendant may be properly convicted even if the jury does not agree on the underlying theory. *Id.* This is because " '[w]hen a statute lists alternative means of committing an offense which in and of themselves do not constitute separate and distinct offenses, jury unanimity is not required with regard to the alternate theory.' " *Id.*, quoting *People v Johnson*, 187 Mich App 621, 629-630; 468 NW2d 307 (1991). Moreover, our Supreme Court has distinguished between "cases in which 'more than one act is presented as evidence of the actus reus of a single criminal offense' " and those "in which defendant may be properly convicted on multiple theories that represent the same element of the offense." *Id.*, quoting *Cooks*, 446 Mich at 512, 515 n 6.

Just as in *Chelmicki*, Milano was not entitled to a more specific unanimity instruction. The trial court clearly instructed the jury that the misconduct in office and conspiracy to commit misconduct charges required proof of malfeasance, which could be demonstrated either by participation in the assault or participation in the subsequent cover-up of the assault. "The alternative theories each relate[d] to a single element of the offense, and [were] merely different ways of establishing that element." *Chelmicki*, 305 Mich App at 68. Whether the theories would be "established through materially distinguishable evidence" is irrelevant in this case. The jury did not need to agree on the theory underlying Milano's convictions, rendering unnecessary a more specific unanimity instruction.

### III. PROSECUTORIAL MISCONDUCT

Milano and Hill both challenge a multitude of comments and statements by the prosecutor during trial, particularly during closing and rebuttal arguments. This was a long, 11-day trial covering the offenses of four defendants represented by four separate attorneys. The trial was marked by antics, questionable tactics, and time-consuming redundancies on both sides

of the aisle. Defendants' appellate challenges to the prosecutor's conduct fall within distinct categories and, given the sheer volume of alleged misconduct, defendants and this Court have limited quotation to a select sampling. Overall, defendants allege that the prosecutor improperly utilized: (a) inflammatory language, (b) civic duty arguments, (c) references to scripture, proverbs or other inappropriate sources, (d) comments denigrating defense counsel, and (e) issues not placed in evidence or beyond the scope of trial.

Questionable commentary on the prosecutor's part was so prevalent during closing and rebuttal argument that the four defense attorneys raised a string of objections. The court wearied of the constant interruptions, and forced the parties to move on without resolving various challenges before ordering the defense attorneys to sit mute. It would be unfair in light of the trial court's stifling of defendants' interjections to hold fast to the rule that challenges to prosecutorial commentary must be preserved by a timely objection. See *People v Brown*, 294 Mich App 377, 382; 811 NW2d 531 (2011). Accordingly, we will review defendants' challenges as preserved.

> Prosecutorial misconduct issues are decided case by case, and the reviewing court must examine the pertinent portion of the record and evaluate a prosecutor's remarks in context. Prosecutors may not make a statement of fact to the jury that is unsupported by the evidence, but they are free to argue the evidence and all reasonable inferences arising from it as they relate to the theory of the case. Prosecutorial comments must be read as a whole and evaluated in light of defense arguments and the relationship they bear to the evidence admitted at trial. [*People v Schutte*, 240 Mich App 713, 721; 613 NW2d 370 (2000) (citation omitted), abrogated in part on other grounds *Crawford v Washington*, 541 US 36; 124 S Ct 1354; 158 L Ed 2d 177 (2004).]

Relief is warranted only when the prosecutor's improper conduct deprives the defendant of "a fair and impartial trial." *People v Watson*, 245 Mich App 572, 586; 629 NW2d 411 (2001).

A. INFLAMMATORY LANGUAGE

Defendants base their challenge to the prosecutor's use of inflammatory language on her repeated reference to the assault as a "beat down." It has long been recognized that prosecutors are permitted to argue the evidence and all reasonable inferences arising therefrom. *People v Gonzalez*, 178 Mich App 526, 535; 444 NW2d 228 (1989). Although "[p]rosecutors . . . have a duty to see that defendants receive a fair trial while attempting to convict those guilty of crimes," they "may use 'hard language' when it is supported by evidence and are not required to phrase arguments in the blandest of all possible terms." *People v Ullah*, 216 Mich App 669, 678; 550 NW2d 568 (1996) (citations omitted). "Emotional language may be used during closing argument and is 'an important weapon in counsel's forensic arsenal.' " *Id.* at 679 (citation omitted). Although the prosecutor's choice of language could, at times, have been more professional, there is no indication that the the term "beat down" was any more inflammatory than the words assault or beating. Further, the repetition of the term, by the end of trial, likely minimized its novelty or impact.

Another example of inflammatory word choice was the prosecutor's statement, "[Y]ou can't see jack . . . from the duty station." The prosecutor recognized that this language was inappropriate and she corrected herself before the jury. The content of the statement, absent the unprofessional language, was highly relevant and its admission does not warrant relief. The parties contested at trial the field of view from the guard station on the subject unit. To this end, the prosecution presented evidence regarding the layout of the unit, as well as visibility. The prosecutor's colorfully worded commentary in closing argument—"you can't see jack first of all from the duty station excuse my language you can't see something from the duty station"—directly addressed that issue.

At another point in closing argument, the prosecutor stated: "I'll eat my hat if you can find through his mouth that the word intercom and usable workable intercom was used in this case. I'll take a bite of my hat if you can find that in this case." Defendants contend that this statement was not only inflammatory but also mischaracterized the evidence regarding the functioning of the guard station intercom. The prosecutor's comment was not a mischaracterization of the evidence; rather, it was a follow-up to an earlier prosecution objection to a defense counsel's assertion that there was actually evidence that the intercom was functioning. While the prosecutor's response may have been overly dramatic, it was not inherently misconduct. It referred to a legitimate evidentiary dispute and the prosecutor was not required to employ the blandest possible terms. See *People v Dobek*, 274 Mich App 58, 67; 732 NW2d 546 (2007); *Ullah*, 216 Mich App at 678.

## B. CIVIC DUTY

Defendants contend that the prosecutor improperly injected civic duty arguments into her closing. As discussed in *People v Bahoda*, 448 Mich 261, 282-283; 531 NW2d 659 (1995) (quotation marks and citations omitted):

> [P]rosecutors are accorded great latitude regarding their arguments and conduct. They are free to argue the evidence and all reasonable inferences from the evidence as it relates to [their] theory of the case. Nevertheless, prosecutors should not resort to civic duty arguments that appeal to the fears and prejudices of jury members or express their personal opinion of a defendant's guilt and must refrain from denigrating a defendant with intemperate and prejudicial remarks. Such comments during closing argument will be reviewed in context to determine whether they constitute error requiring reversal.

As such, a prosecutor may not urge jurors to convict a defendant in accordance with their "civic duty." *People v Abraham*, 256 Mich App 265, 273; 662 NW2d 836 (2003).

The prosecutor never used the term "civic duty" in urging the jurors to convict in this case. At one point, the prosecutor acknowledged that many might believe the offenders had a right to abuse the victim because they were law enforcement officers and the victim was merely a criminal:

-5-

Ladies and gentlemen, it's what the elephants in the room [sic] these guys are criminals these guys got a badge so you are suppose [sic] to disregard that and let them continue.

That verdict will stop this behavior and that is why we are here.

The prosecutor later argued that defendants thought they could get away with their conduct: "There is no fear of any repercussion and only by your verdict can you tell them that what they did was wrong that day." Defense attorneys objected to both statements, with the trial court sustaining the first and overruling the second.

A central issue in this case was the believability of the prosecution witnesses—criminals spending time in the Wayne County Jail—who were accusing Wayne County Sheriff deputies of violent criminal acts. The prosecutor's challenged comments were responsive to that theme, arguing that the defendants were not necessarily credible even though they were law enforcement officers. Further, the prosecutor's reference to the lack of "fear of any repercussions" followed a summary of evidence that the defendant officers bullied the inmate witnesses into silence immediately following the incident. Placed in context, these were not improper arguments.

## C. SCRIPTURE REFERENCES

Defendants also challenge the prosecutor's repeated citations to scripture or proverbs. Specifically, the prosecutor quoted "Ralph Waldo Emerson who said whatever [sic] a man commits a crime God finds a witness and every secret crime has its reporter." The prosecutor later "renew[ed] my proverbs the new testament. [sic] Luke 19:22" and argued, "Out of thy own mouth I will judge thee."

While this was an overdramatic method to express her idea, the prosecutor's references do not rise to the level of misconduct. Although a prosecutor may not "appeal to a jury's religious duties in calling for conviction," "[t]he argument of counsel should not be so restricted as to prevent reference, by way of illustration, to principles of divine law or biblical teachings." *People v Mischley*, 164 Mich App 478, 483; 417 NW2d 537 (1987) (citations omitted). Here, as in *Mischley*, the challenged statements "taken in context, show[] that the biblical quotation was properly used as an illustration" or to emphasize the argument of the prosecutor regarding the credibility of the witnesses, the reasons for the delay in prosecuting this case, and discrepancies in the witnesses' memories of the events. *Id.*

## D. DENIGRATING THE DEFENSE

Defendants further contend that the prosecutor denigrated defense counsel and the credibility or sincerity of the defense theories at trial. Specifically, during closing argument, the prosecutor accused the defense attorneys of dramatic conduct: "the screaming and the kicking of the barrier and the claim that they're getting emotionally upset and maybe grabbing for the Kleenex," "when [counsel] comes in here and throws paper around and gets teary eyed at you." The prosecutor seemingly ridiculed defendant Hill's counsel's reference to himself in closing argument as a soldier for his client. The prosecutor also accused the defendant deputies of being "in a position to control the information" and of "counting on [the jurors] to say [the victim and

-6-

prosecution witnesses] are inmates don't believe them." During the trial itself, the prosecutor interrupted questioning to accuse defendants of "running their mouths about talking about he's this and he's that if I can hear it I know this jury can."

The prosecutor also used the term "red herring" in rebuttal argument, a term that historically has been frowned upon. The prosecutor stated, "So I suggest that to you ladies and gentlemen because a lot of what I called nonissue[s] or red herrings are brought up by the defense in closing." The prosecutor then acknowledged defendants' argument that they were not charged until long after the assault, but noted that the jury could not speculate regarding the cause of the delay. "To speculate about things and put red herrings out there. You know why, because it takes your focus off of what they did." The prosecutor returned to this theme, urging the jury that the evidence was sufficient to find all four defendants guilty and "to do otherwise has DeShawn Bragg whose looking for justice not a civil suit ladies and gentlemen. Again it's another red herring that is put out here."

As noted, the prosecutor "must refrain from denigrating a defendant with intemperate and prejudicial remarks." *Bahoda*, 448 Mich at 283. The prosecutor may not impugn defense counsel's veracity or argue that defense counsel is trying to mislead the jury. *People v Dalessandro*, 165 Mich App 569, 580; 419 NW2d 609 (1988). The majority of the prosecutor's comments did not actually accuse the defense attorneys of trying to mislead the jury. Rather, the prosecutor emphasized the theatrics employed by defense counsel to prove to the jury their belief in their clients' innocence.

The prosecutor's remark that defendants controlled the information and that defendants tried to discredit the prosecution witnesses was also not improper, although likely worded too strongly. While the prosecutor may not use the power and prestige of her office to vouch for the credibility of her witnesses, *Bahoda*, 448 Mich at 276, the prosecutor may respond to the defense's credibility attacks. See *People v Thomas*, 260 Mich App 450, 455; 678 NW2d 631 (2004).

Moreover, employing the term "red herring" does not automatically signal misconduct. In using this term, the prosecutor referenced the theories and arguments of the defense attorneys and suggested an attempt to distract the jury from the evidence presented and legitimate issues in the case. The "prosecutor's designation of defense counsel's arguments as 'red herrings' did not generate the type of accusatory prejudice decried" in earlier cases from this Court. *Dobek*, 274 Mich App at 67, citing *Dalessandro*, 165 Mich App at 579-580.

### E. ISSUES NOT IN EVIDENCE OR BEYOND THE SCOPE OF TRIAL

The final category of challenges raised by defendants is more amorphous and harder to describe. Milano describes these comments as "evidentiary harpoons; the evidence is thrown out, stabbed, and then withdrawn." This was done, Milano argues, in order to place improper information before the jury in a hit-and-run manner designed to prejudice the jury and preclude correction by the trial court. Through this method, the prosecutor introduced information into the trial that had no relevance, and withdrew the information without the issue being fleshed out. For example, the prosecutor asked an internal affairs investigator about at killing at the Dickerson Facility. Upon a defendant's objection, the prosecutor instructed the jury "disregard

that." The prosecutor asked another detective, "Are you the guy that's got your neck hurt by Mr. Kilpatrick?" At other times, the prosecutor employed leading questions about the uniform patch allegedly ripped during the struggle and the victim's description.

Information about events at Dickerson and injuries caused by Kwame Kilpatrick were certainly irrelevant in this trial. However, the information was so irrelevant that its presentation before the jury could have no impact on the verdict. Defendants objected to the challenged leading questions and the court ordered the prosecutor to rephrase the inquiries. The alleged instances of misconduct were mild enough that a requested curative instruction could have eliminated any potential prejudice. See *People v McElhaney*, 215 Mich App 269, 283-284; 545 NW2d 18 (1996).

Milano also contends that the prosecutor misstated the law in closing argument. In discussing the conflicting versions of events provided by the deputies and the inmates, the prosecutor stated:

> Focus in on [sic] you must decide whom you believe. Because once you decide that ladies and gentlemen the verdict form is going to be a piece of cake.

> Because you can't have part of one and the other[.] [E]ither you believe what happened to DeShawn according to DeShawn[,] Ryan and Chad or you believe Matthew Czarnecki and Allan Oliver and Bryan Milano and Jeffrey Hill.

Milano asserts that this statement contradicts CJI 2d 6.6, which permits jurors to accept or reject all or any portion of the testimony of any witness. Taken in context, the prosecutor was emphasizing how diametrically opposed the parties' positions were regarding the initiation of the assault. It that regard, the prosecutor correctly noted that the jurors would have to accept one side or the other.

### F. CUMULATIVE ERROR

Finally, defendants assert that the cumulative impact of the prosecutor's misconduct requires a new trial. "Where there is no allegation that prosecutorial misconduct violated a specific constitutional right, a court must determine whether the error so infected the trial with unfairness as to make the resulting conviction a denial of due process." *People v Blackmon*, 280 Mich App 253, 262; 761 NW2d 172 (2008). "The cumulative effect of several errors can constitute sufficient prejudice to warrant reversal even when any one of the errors alone would not merit reversal, but the cumulative effect of the errors must undermine the confidence in the reliability of the verdict before a new trial is granted." *Dobek*, 274 Mich App at 106. However, only actual errors are subject to aggregation. *People v Rice (On Remand)*, 235 Mich App 429, 448; 597 NW2d 843 (1999).

Cumulative error does not warrant a new trial in this case. Many of the challenges raised by defendants do not rise to the level of misconduct on the prosecutor's part. Many improper comments were dealt with swiftly through sustained objections by defense counsel. Viewing only the challenged comments that could be construed as misconduct in context, neither Milano nor Hill have demonstrated that the cumulative effect of any errors denied them a fair trial.

## IV. PRIOR ACT EVIDENCE

Milano challenges the trial court's admission of evidence regarding an incident in 2008 involving only codefendant Czarnecki. Milano argues that because all four defendants were tried before a single jury, the probative value of this evidence was substantially outweighed by the potential of unfair prejudice to Milano, Hill and Oliver. "This Court reviews de novo both constitutional claims and preliminary questions of law regarding admissibility of evidence" and the ultimate admissibility decision for an abuse of discretion. *People v Duenaz*, 306 Mich App 85, 90; 854 NW2d 531 (2014).

The evidence at issue involved a 2008 scuffle between Czarnecki and a jail inmate, Dwayne Lowery. The current victim, Bragg, was housed several cells down from Lowery, and asserted that he was locked in his cell during the incident. Czarnecki accused Bragg of being out of his cell and of stabbing him with a pencil. As evidence of Czarnecki's bias against him, Bragg presented evidence that Czarnecki once followed him from a Highland Park store.

The evidence was admitted against Czarnecki as proof of motive pursuant to MRE 404(b)(1). Czarnecki's 2008 jailhouse altercation with Lowery led to his accusations against Bragg and explained why Czarnecki would assault Bragg in his cell in 2010, making the evidence highly relevant as required by MRE 402. However, evidence is only admissible under MRE 404(b) if "the probative value of the evidence is not substantially outweighed by its potential for undue or unfair prejudice under MRE 403." *Dobek*, 274 Mich App at 85.

Here, the danger of prejudice to Milano, Hill, and Oliver was minimized by the prosecutor and the court. When questioning Lowery about the 2008 incident, the prosecutor repeatedly stressed to the witness before the jury that her questions pertained only to Czarnecki. Czarnecki's counsel cross-examined Lowery. While Oliver's counsel also engaged in cross-examination, one goal was to definitively establish that Oliver was not involved in the 2008 incident. Milano's counsel waived cross-examination, noting, "No he was not offered against my client, so no questions." The prosecutor again emphasized when presenting the testimony of Corporal Maurice Lewis, who intervened in the 2008 altercation, that his testimony related "to the same incident involving Matthew Czarnecki." Only Czarnecki's counsel cross-examined Lewis, and Oliver's counsel emphasized that he would forego examination because "this was not offered against my client." The prosecutor then presented evidence that Czarnecki had encountered Bragg at a Highland Park store following the 2008 incident. The prosecutor began by informing the jury that the witness to the store incident was "being presented only against Matthew Czarnecki." During final jury instructions, the court reminded the jurors that each defendants' criminal liability had to be assessed separately and "[i]f any evidence is limited to one defendant you may not consider it as to any other defendant."

There is a strong presumption that jurors follow a trial court's instructions. *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998). And limiting instructions that detail the proper use of prior acts evidence "protect[] a defendant's right to a fair trial." See *People v Kahley*, 277 Mich App 182, 185; 744 NW2d 194 (2007). The evidence was relevant to proof of motive regarding Czarnecki and the prosecutor specifically stated that the prior acts evidence was presented only against Czarnecki. The court gave a limiting instruction and we must presume that the jury heeded that directive. Accordingly, Milano is unable to demonstrate that

the evidence was unduly prejudicial. See *People v Pesquera*, 244 Mich App 305, 320; 625 NW2d 407 (2001) ("The limiting instruction given to the jury also served to limit the danger of unfair prejudice by restricting use of the evidence.").

## V. SUFFICIENCY OF THE EVIDENCE

Finally, Milano asserts that the prosecutor presented insufficient evidence to sustain his misconduct in office and conspiracy convictions. The trial court denied Milano's motion for a directed verdict of acquittal on this ground. In relation to a sufficiency challenge, whether raised for the first time on appeal or in a directed verdict motion, we review "the evidence in a light most favorable to the prosecutor to determine whether any trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt." *People v Robinson*, 475 Mich 1, 5; 715 NW2d 44 (2006); *People v Lewis (On Remand)*, 287 Mich App 356, 365; 788 NW2d 461 (2010), vacated in part on other grounds 490 Mich 921 (2011).

To support a misconduct in office charge, "the prosecutor must prove that the defendant (1) is a public officer, (2) the misconduct occurred in the exercise of the duties of the office or under the color of the office, and (3) is corrupt behavior." *Milton*, 257 Mich App at 471. The misconduct may be established through "(1) malfeasance, committing a wrongful act, or (2) misfeasance, performing a lawful act in a wrongful manner, or (3) nonfeasance, failing to do an act required by the duties of the office." *Id.* There is no dispute that Milano was a public officer or that his acts were undertaken in the exercise of his duties as a Wayne County Jail guard. See *People v Perkins*, 468 Mich 448, 457; 662 NW2d 727 (2003) ("[A] deputy sheriff is a public officer for purposes of misconduct in office when the allegations against him arise from the performance of his official duties."). Milano was in uniform and on duty at the time of the assault and his report describing the incident. As such, the only element in dispute is the sufficiency of the evidence demonstrating Milano's "corrupt behavior."

The misconduct in office charge was premised on two theories: Milano's participation in the assault against Bragg and his subsequent efforts to falsify records regarding the incident. There was sufficient evidence to sustain Milano's conviction under the assault theory. Milano was one of four deputies assigned to the unit at the time in question. There is no dispute that Bragg was severely injured after being beaten. The deputies' written reports confirmed Milano's presence. Bragg testified that Milano was in his cell during and participated in the assault. Another inmate identified Milano as the deputy who struck Bragg from behind. Bragg and his cellmates all testified that the beating was unprovoked and appeared prearranged, with the four deputies wearing black gloves and entering together to block Bragg's escape. The deputies continued their assault after Bragg was rendered defenseless on the floor. One of the deputies called out "body shots" during the attack, and the deputies moved the focus of their blows from Bragg's head to his body. While Milano and his codefendants contended that Bragg instigated the events and that they justifiably responded to subdue Bragg and protect a fellow officer, this was a credibility contest solely within the jury's province of review. See *People v Eisen*, 296 Mich App 326, 331; 820 NW2d 229 (2012) (quotation marks and citation omitted) ("[I]t is the role of the jury, not this Court, to determine the weight of the evidence or the credibility of witnesses."). Even so, we note that the evidence supported the jury's determination that Bragg did not instigate the assault. Bragg sustained multiple severe facial injuries requiring hospitalization, while none of the deputies suffered any visible or reported injuries other than a

ripped uniform patch. That the jury acquitted Milano of the assault charges is not controlling as a jury may enter inconsistent verdicts. See *People v Wilson*, 496 Mich 91, 100-101; 852 NW2d 134 (2014).

Conviction of misconduct in office was also supported under the cover-up theory. Following the assault, Milano completed a written statement. The four deputies' reports were sufficiently similar to suggest that Bragg and Czarnecki were involved in a physical altercation that necessitated the assistance and involvement of the other officers, including Milano. The reports suggested that Bragg assaulted Czarnecki and the others intervened to subdue the inmate. As noted above, the evidence tends to support that Bragg did not attack Czarnecki; Milano, Hill, and Oliver knew that Bragg did not instigate the attack; and yet participated in an assault well beyond that necessary to subdue an inmate. This would render false Milano's description of events in his report, supporting his conviction.

To establish a conspiracy to commit misconduct in office, the prosecutor was required to present "evidence of specific intent to combine with others to accomplish an illegal objective." *People v Izarraras-Placante*, 246 Mich App 490, 493; 633 NW2d 18 (2001). Specifically:

> A criminal conspiracy is a partnership in criminal purposes, under which two or more individuals voluntarily agree to effectuate the commission of a criminal offense. The individuals must specifically intend to combine to pursue the criminal objective, and the offense is complete upon the formation of the agreement. The intent, including knowledge of the intent, must be shared by the individuals. Thus, there must be proof showing that the parties specifically intended to further, promote, advance, or pursue an unlawful objective. Direct proof of a conspiracy is not required; rather, proof may be derived from the circumstances, acts, and conduct of the parties. [*People v Jackson*, 292 Mich App 583, 588; 808 NW2d 541 (2011) (quotation marks and citations omitted).]

Milano's written report was so similar to the other deputies' reports that it either had to accurately describe the events or be the result of a plan to report the events in a particular manner. The evidence supports that the assault did not occur as suggested by the deputies, meaning the reports must have been false. And the similarities support a cover-up conspiracy. Moreover, Milano provided witness statement forms to the inmates who saw or heard the events. The four codefendant deputies remained on the unit after the incident. Bragg's cellmates suggested that the deputies' continued presence and their role in securing the statements caused the inmates to fear retribution if they accurately reported that the deputies instigated the assault. A conspiracy may be demonstrated or proven by circumstantial evidence or reasonable inferences based on the evidence. *People v Justice (After Remand)*, 454 Mich 334, 347; 562 NW2d 652 (1997); *People v Cotton*, 191 Mich App 377, 393; 478 NW2d 681 (1991). Viewing

the evidence in the light most favorable to the prosecution, the prosecutor presented adequate proof of the existence of a conspiracy and Milano's participation.

We affirm.

/s/ Michael J. Talbot
/s/ William B. Murphy
/s/ Elizabeth L. Gleicher