# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

MATTHEW MORRIS BAKER,

      Defendant-Appellant.

UNPUBLISHED
October 13, 2016

No. 327356
Wayne Circuit Court
LC No. 14-010207-01-FH

Before: FORT HOOD, P.J., and GLEICHER and O'BRIEN, JJ.

PER CURIAM.

A jury convicted Matthew Baker of extortion, MCL 750.213, unarmed robbery, MCL 750.530, unlawful imprisonment, MCL 750.349b, larceny $1,000 or more but less than $20,000, MLC 750.356(3)(a), and larceny in a building, MCL 750.360. Baker accuses the prosecutor of misconduct. Although the prosecutor was at times overzealous, the trial court always reined him in and a new trial is not required. Baker also raises several meritless challenges to the evidentiary support for his sentencing guidelines scores. However, Baker is entitled under *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015), to seek resentencing under the new constitutional parameters. Accordingly, we affirm Baker's convictions and remand for further sentencing procedures.

## I. BACKGROUND

This case is a prime example of the adage "no good deed goes unpunished." Ross Farr opened his home for free to a young woman, Rebecca Stone, who was homeless and pregnant with her second child. Farr was rarely home, working 80 to 90 hours each week. In Farr's absence and against Farr's rules, Stone allowed her boyfriend, Baker, to visit her at the house. During these visits, Baker secreted $995 in money orders from Farr's home. Farr evicted Stone after discovering the theft, but allowed her time to find employment and a place to live. To assist Stone's efforts, Farr rented a car for her.

On March 6, 2014, Farr returned home from work at 6:45 a.m. to find Stone intoxicated and despondent. Farr went to his bedroom to avoid Stone, but she followed him. Baker suddenly appeared and attempted to force Farr to sign paperwork requiring Farr to give Stone money. When Farr refused, Baker became angry and threatened Farr. Pretending to have a weapon in his pocket, Baker forced Farr to drive him and Stone to the credit union and then

-1-

forced Farr to withdraw $6,000. Upon their return to Farr's residence, Stone absconded with the rented vehicle.

Farr reported the theft of his money orders, the events leading up to his forced withdrawal at the credit union, and Stone's exodus with the rental vehicle. Shortly thereafter, he found the rental car parked a block from his home with the keys in the ignition. Fearing for his safety, Farr changed the locks on his home, boarded up his windows, and installed a video surveillance system.

On April 10, 2014, Baker struck again. Farr exited his house and walked toward his garage so he could leave for work. Baker approached and demanded more money. He followed Farr into the garage and threatened to beat him to death if Farr did not comply. Baker then forced Farr to drive him to the credit union and withdraw another $4,822.

As soon as Farr was alone, he travelled to the police station to report the incident. During the investigation, police uncovered several savings bonds belonging to Farr at two houses where Baker had recently stayed. Someone had signed the bonds and unsuccessfully tried to cash them.

Baker took the stand to deny Farr's version of events. He claimed that Stone paid Farr $5,000 to live in his home and was forced to find a new residence not because Farr evicted her, but because she was in the midst of a child protective proceeding and discovered that Farr was a registered sex offender. Baker contended that he had to assist Stone in securing the return of the $5,000 and claimed that this amount was the sum total of funds that Farr returned to them. Stone's aunt took the stand to rebut this testimony. She explained that before Stone moved into Farr's home, Stone had gambled away all her money and did not possess $5,000 to pay Farr.

## II. PROSECUTORIAL MISCONDUCT

Baker accuses the prosecutor of several acts of misconduct while cross-examining him. Baker's counsel objected to some comments, but not others. While we review de novo preserved challenges, we review Baker's unpreserved claims for plain error affecting his substantial rights. *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010). "[T]he test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). "Issues of prosecutorial misconduct are decided case by case, and this Court must examine the entire record and evaluate a prosecutor's remarks in context," including "in light of defense arguments." *Id.* "Generally, prosecutors are accorded great latitude regarding their arguments and conduct." *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995) (quotation marks and citation omitted). "[P]rosecutors may use 'hard language' when it is supported by evidence and are not required to phrase arguments in the blandest of all possible terms." *People v Ullah*, 216 Mich App 669, 678; 550 NW2d 568 (1996).

Baker cites numerous incidents during cross-examination where the prosecutor "asked argumentative and sarcastic questions" and impugned Baker's character. The first challenged interaction proceeded as follows:

> *Q*. But your testimony is that . . . Stone . . . got your driver's license as part of this home study through Child Protective Services [CPS] and therefore she must have put your driver's license on this money order, right?

*A*. I did not put that on there.

*Q*. Well I'll tell you what, nobody else had your driver's license, right?

*A*. I'm not sure about - -

*Q*. It doesn't make any sense. The only person who would be in possession of one of Ross Farr's - -

*[Defense Counsel]*. Objection, Your Honor, argumentative.

*The Court*. Sustained.

Although the prosecutor's tone may have been snide, the question itself was soundly based in the evidence. When Farr's stolen money orders were cashed, one bore Baker's driver's license number. On direct, Baker claimed that Stone stole the money orders, pulled his driver's license number from CPS paperwork, and used that number without his knowledge to cash one of the money orders. The prosecution questioned the authenticity of that claim, a valid line of inquiry.

After additional questions regarding the use of Baker's driver's license number, the prosecutor queried:

*Q*. Okay. Now . . . you testified that you are self-employed and that you run . . . an operation of purchasing and reselling tickets, correct?

*A*. Yes, sir.

*Q*. Is this a scalping operation?

*[Defense Counsel]*. Objection, Your Honor, "Scalping" is a derogatory word. He's trying to now impugn my client's character.

*The Court*. . . . I will sustain the objection.

Scalping - - I don't know whether it's legal - - what's legal or not legal as far as the selling or buying of tickets, but I will sustain the objection.

Baker continues to argue that the prosecutor impugned his character by implying that he regularly engaged in illegal activities. Yet, this line of questioning was fair. In truth, defense counsel should have allowed Baker to answer and explain his business to establish its legality.

The prosecutor subsequently launched an inquiry regarding Baker's children.

*Q*. Alright. You testified earlier that you have four kids, right, and three of them are with Ms. George, right? And one of them is with Ms. Stone?

*A*. That's correct, sir.

*Q*. And the child that's with Ms. Stone is [D], correct?

-3-

*A.* Correct, sir.

*Q.* Alright. Now Ms. Stone had a child while she was residing with Mr. Farr, right?

*A.* Correct.

*Q.* And that's not your child?

*A.* He was given up for adoption.

*Q.* Okay. So first of all it was a "he"?

*A.* It was a "she".

*Q.* Okay. And "she's" name was [R], right?

*A.* I'm not - - I'm not quite sure on the name.

*Q.* Okay.

*A.* The birth certificate - -

*Q.* Well how about this, her last name is Baker, right?

*A.* I'm not sure on that either.

*Q.* Well was she given up to a person that just happens to have the same last name as you, sir?

*[Defense Counsel].* I'm going to object, Your Honor, as to my client's knowledge causing him to speculate as to the adoption process and that birthing process.

*The Court.* I'm going to sustain the objection on the basis that it's argumentative.

You can save that part for closing.

*[Prosecutor].* That's fair.

Whether Baker had fathered Stone's children and his acceptance of placing Stone's infant up for adoption was relevant in evaluating whether Baker would falsely shift the blame for the money order thefts onto Stone. In fact, Baker later conceded that he and Stone gave their daughter up for adoption. The prosecutor's final question was sarcastic and unprofessional and may have crossed the line into the realm of impropriety. But this misconduct did not deny Baker a fair and impartial trial, given the court's immediate correction.

-4-

The prosecutor then ventured into the area of Stone's gambling addiction. Evidence established that prior to the offenses in question, Stone had secured "many thousands of dollars" as a settlement in a personal injury lawsuit. Stone frequented casinos and, according to her aunt, lost the entirety of her settlement to gambling. On cross-examination, Baker claimed that Stone visited casinos only "sporadically" and denied knowledge that she had gambled away her savings. The prosecutor attempted to impeach this testimony:

> *Q*. Okay. And might January of 2013 been one of those months that [Stone] went [to the casino] five or ten times?

> * * *

> *Q*. What do you think, Mr. Baker?

> *The Court*. Well you're not asking what he thinks, you're asking what he knows.

> *Q*. What do you know?

> *A*. Can you repeat that question?

> *Q*. The question is, might in January and February of 2013, right when she got her settlement check, might that have been a period of time where she was going quite often to the casinos?

> *A*. Possibly.

> *Q*. Because she ran out of money almost instantly, right?

> *A*. I'm not aware of that.

> *Q*. Well look, you're the father of multiple children with her, right? And you testified to this jury about how she - - you know, you've known her for a long time, she lived with you in Ohio, lived with you in Michigan, and you don't know whether or not this person who gets a settlement check, or multiple checks, you don't know what happens to that money is what you're telling this jury?

> *[Defense Counsel]*. Objection, argumentative, Judge.

> *The Court*. I'll sustain the objection.

Although this exchange was heated, the line of questioning was fair. Baker asserted that Stone paid Farr a $5,000 deposit to live in his home and that any money received from Farr was a legal repayment of that sum. The evidence suggested that Stone had not possessed $5,000 to give Farr and this cover story was false. Testing the veracity of Baker's alleged ignorance of Stone's finances and gambling addiction was fair game.

-5-

Cross-examination continued on the following day of trial. Early in the process, the prosecutor began a new line of attack:

> *Q*. And that when you were in the bank, . . . did you talk with Mr. Farr while he was taking the money out?
>
> *A*. I don't recall, no.
>
> *Q*. Okay. So to your . . . memory, you didn't even talk with Mr. Farr?
>
> *A*. I don't think so, no.
>
> *Q*. Okay. So the bank teller is not telling the truth when she says that you guys were conversing with each other?
>
> *The Court*. I don't want you to ask him to comment on the voracity [sic] or lack of voracity [sic] of a witness . . . .

It was improper for the prosecutor to ask a criminal defendant to comment on the veracity of the state's witnesses. "It is not proper for a prosecutor to ask a defendant to comment on the credibility of prosecution witnesses since a defendant's opinion on such a matter is not probative and credibility determinations are to be made by the trier of fact." *People v Knapp*, 244 Mich App 361, 384; 624 NW2d 227 (2001) (quotation marks and citation omitted). Where the defendant accuses the particular witness of lying, however, such questions are not "harmful" to the defense. *Id.* at 385. Here, Baker never accused the bank teller of lying; rather, he testified about his memory of events on March 6, 2014. That his memory did not coincide with the bank teller's was not an accusation of dishonesty and the prosecutor's questions in this vein were improper. The improper question does not require a new trial, however. The court's quick reaction and curative instruction ensured the jury's awareness that the prosecutor had crossed the line, not the defendant.

Baker testified that he and Stone rented a truck and moved her belongings to a U-Haul storage unit. He claimed that he returned to Farr's house on April 10 merely to collect the rest of Stone's belongings to place into storage. On cross, the prosecutor implied that Baker's story was incredible:

> *Q*. Okay. Now we're going to get to the U-Haul place in a second.
>
> Isn't it true that you're making this whole thing up about storing stuff at a storage facility?
>
> *[Defense Counsel]*. Objection as to argumentative, Judge.
>
> *The Court*. I think the single question isn't argumentative by itself. You can ask the question.
>
> *Q*. Aren't you making that all up, Matt?

-6-

*A*.  No, I'm not.

*Q*.  So it's not the case that she took all of the stuff and put it at her aunt's house, Ms. Zezula?

*A*.  All of what stuff?

*Q*.  All of her property from Mr. Farr's house goes to Ms. Zezula's house, that's not the case?

*A*.  Absolutely not.

*Q*.  Okay.  So - - not first of all, you don't have any receipt for this U-Haul, do you?

*A*.  I don't have a receipt, no.

*Q*.  You don't have anything from this storage unit, right?

*A*.  No, I do not.

*Q*.  So we're taking your word about any of this, right?

*[Defense Counsel]*.  Objection, Your Honor, as to argumentative.

*The Court*.  I would sustain the objection. . . .

The prosecutor's line of questioning was a proper response to Baker's claim that he and Stone placed her belongings in a storage unit.  Stone's aunt testified that Stone stored all her belongings at her house after her eviction.  This connection was important because Stone's aunt claimed intimate knowledge of Stone's personal life, including that she gambled away her lawsuit settlement.  Baker undermined the aunt's credibility and the prosecutor was free to impeach Baker's testimony in this regard.  The prosecutor may have asked the questions in an improperly argumentative fashion, but the trial court put an end to it.

Regarding the April 10 encounter, the prosecution presented a video from Farr's surveillance system depicting that Baker and Farr were in the garage and out of sight for 24 minutes.  Baker denied that he threatened Farr during this time and that the men loaded Farr's truck with Stone's belongings.  The prosecutor grilled Baker regarding his appearance in the driveway that morning.  Baker testified that Farr expected him, but the prosecutor suggested that Baker stood in a hidden corner and startled Farr when he came out to leave for work.  When Baker did not back down from his story, the prosecutor's questioning became more aggressive:

*Q*.  Okay, fair enough.

So now he[re] goes Mr. Farr with his cooler on his way to work and he is going to be spending, according to you, the next 24 minutes in this garage with

you just handing out - - 24 minutes with you - - while you do whatever it is you're doing, that's your testimony?

     *A.* However long I was in there.

     *Q.* Do I need to replay this? It's exactly 24 minutes, give or take a few seconds.

     *A.* If that's what you say.

     *Q.* Okay. So - - and by the way, just a second ago you said that it took you 10 to fifteen minutes to get this stuff into this truck right?

     *A.* I think you asked me how long I was going through the stuff for.

     *Q.* Alright, so go ahead, keep going, try to make it 24 minutes, sir. Is that how long - - it probably was exactly 24 minutes, wasn't it? That's your testimony?

     *A.* I mean however long we were in the garage for, that's what you say, 24 minutes - - and that's what it was.

Baker claims that this line of questioning continued amidst "numerous sustained objections." This is a mischaracterization of the record. The prosecutor moved on to question why Farr would agree to meet Baker alone after "this big blow up" between the parties. The questions were argumentative, but counsel never objected. In any event, the argument was brief.

Baker accuses the prosecutor of immediately continuing his "sarcastic" attack of Baker's testimony. While reviewing the home surveillance footage with Baker, the prosecutor queried:

     *Q.* Okay. And you saw him appear startled when he sees you standing right behind his house, right?

     *A.* I said, I don't think he appeared startled.

     *Q.* So with all this going on, it's your testimony to this jury that he then spends the next 24 minutes in this garage just hanging out with you, with all this going on?

     *The Court.* That's argumentative. You need to save that for closing.

The prosecutor's questions were aggressive, but the topic was open to review. The prosecutor continued by inquiring what exactly Farr did while the men were in the garage. It was then that the court sustained repeated objections to argumentative questions. Again, the prosecutor dissolved into sarcasm: "[W]hat was he, eating some of his stuff out of his cooler, enjoying a cup of cola or something like that?" But again, the court sustained an objection that the prosecutor's questions were argumentative.

Baker challenges the propriety of the prosecutor's inquiries as he continued to question Baker's version of events after he loaded Stone's belongings into Farr's truck:

> *Q.* . . . Alright. So it is - - it is 3:33 when you all leave the driveway, right? And it takes you five minutes to get to the U-Haul, that's your testimony, right?
>
> *A.* Give or take.
>
> *Q.* And the - - so it's about five minutes later, we'll call that 3:38, you're at U-Haul.
>
> It takes you a few minutes to get the stuff out of the car.
>
> And yet it is not until 4:21, according to Exhibit #4, that this amount of money gets taken out of the bank.
>
> He must have been driving slow, I guess, Mr. Baker?
>
> *[Defense Counsel].* Objection, Your Honor, argumentative and to ask this client, to ask my client to know what Mr. Ross did or didn't do after he left him.
>
> *The Court.* [Prosecutor]?
>
> *Q.* Do you know if he went straight to the bank? Did he tell you that?
>
> *A.* I don't know what he did after I got out of the truck.
>
> * * *
>
> *Q.* Okay. And then you heard him testify that he went to the police.
>
> He's just making all this stuff up, isn't he, sir?
>
> *The Court.* [Prosecutor]?
>
> *Prosecutor.* Yes?
>
> *The Court.* I've indicated before that you cannot ask the witness to comment on the voracity [sic] of the testimony of another witness.

Although Baker complains of the unprofessional tenor and argumentative tone of these questions, his answers were given in the same spirit. Baker informed the jury that he left Farr's company after travelling to the U-Haul storage facility and therefore could not know Farr's actions thereafter. And the court reminded the prosecutor in the jury's presence that his attempt to have Baker comment on the victim's truthfulness was improper.

Finally, Baker complains of another line of questioning during which the prosecutor inquired whether Baker was "confused" about his answers. When Baker testified that he

"absolutely" did "not" try to cash the money orders, the prosecutor noted, "Okay, I'm writing that down." This commentary was certainly unnecessary. However, it in no way prejudiced Baker. Rather, it made the prosecutor appear childish and unprofessional.

Overall, the prosecutor did act unprofessionally at times and forayed into forbidden areas. However, Baker cannot demonstrate the necessary prejudice to merit relief given that the trial court gave several curative instructions and kept tight control over the prosecutor's questions. See *Bahoda*, 448 Mich at 281 ("Assuming there was some impropriety in this argument, the judge's instruction that arguments of attorneys are not evidence dispelled any prejudice."); *People v Callon*, 256 Mich App 312, 331; 662 NW2d 501, 513 (2003) ("Thus, the trial court's instructions [that the attorney's statements were not evidence] dispelled any prejudice arising from the prosecutor's comment."). "Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors." *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003). Accordingly, we discern no ground to grant Baker a new trial.

### III. SENTENCING

Baker also challenges the within-guidelines sentences imposed for his offenses. His attack is two-pronged, contesting the evidentiary support for the scoring of several offense variables (OVs) and the constitutionality of basing his scores on judicially found facts. As noted by this Court in *People v Biddles*, ___Mich App ___; ___NW2d ___ (Docket No. 326240, issued June 30, 2016), slip op at 4, each of these "challenges has its own distinct remedy." When a court "clearly err[s] in finding that a preponderance of the evidence supported one or more of the OVs or otherwise erred in applying the facts to the OVs, *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013), and if the scoring error resulted in an alteration of the minimum sentence range, he would be entitled to resentencing, *People v Francisco*, 474 Mich 82, 89; 711 NW2d 44 (2006)." *Biddles*, slip op at 4. A constitutional challenge under *Lockridge*, 498 Mich 358, however, does not demand remand for resentencing. Rather, under *United States v Crosby*, 397 F3d 103 (CA 2, 2005), on remand the defendant has the choice whether to pursue resentencing. *Biddles*, slip op at 4-5. As an evidentiary error demands resentencing and a constitutional error only a possibility of resentencing, this Court must consider evidentiary challenges first. If an evidentiary error demands resentencing, the constitutional error is rendered moot. *Id.* at 5.

> Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence. Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo. [*Hardy*, 494 Mich at 438.]

Baker first challenges the evidentiary support for scoring five points for OV 1, aggravated use of a weapon. MCL 777.31(1)(e) requires a five-point score when "[a] weapon was displayed or implied." MCL 777.31(2)(c) further provides, "Score 5 points if an offender used an object to suggest the presence of a weapon." Baker's score was supported by a preponderance of the evidence. Farr testified that during both incidents Baker informed him that he possessed a gun and revealed the outline of what appeared to be a gun in his pocket. Although the jury did not find beyond a reasonable doubt that Baker was armed and therefore

convicted Baker of a lesser included unarmed robbery charge, the court was free to find the presence or implied presence of a weapon by a preponderance.

Baker also challenges the court's assignment of 15 points for OV 8, asportation of a victim. MCL 777.38(1)(a) supports a 15-point score when "[a] victim was asported to another place of greater danger or to a situation of greater danger or was held captive beyond the time necessary to commit the offense." Record testimony established that on April 10, 2014, Baker followed Farr into his closed garage where the two men remained for 24 minutes. During that time, Baker threatened Farr with violence if Farr did not take Baker to the bank to withdraw funds. Farr was unable to summon help given their hidden location. Moreover, on both March 6 and April 10, Baker forced Farr to drive to a bank by threatening to kill him with the gun in his pocket. Baker thereby asported his victim, supporting the score.

Baker contends that the court erroneously scored 10 points for OV 10, exploitation of a vulnerable victim. A 10-point score is warranted when "[t]he offender exploited a victim's physical disability, mental disability, youth or agedness, or a domestic relationship, or the offender abused his or her authority status." MCL 777.40(1)(b). Victim "vulnerability" is defined by MCL 777.40(2)(c) as the "readily apparent susceptibility of a victim to injury, physical restraint, persuasion, or temptation." Exploitation of such a victim is described as the "manipulat[ion] [of] a victim for selfish or unethical purposes." MCL 777.40(2)(b). Baker is approximately 25 years younger than Farr. On March 6, Baker used his superior strength to corner Farr in his bedroom and threaten Farr with violence unless he cooperated in Baker's demands. On April 10, Baker used similar methods to trap Farr in his garage and coerce his cooperation. On this record, we discern no ground for relief.

The trial court assigned 10 points for OV 14. A 10-point score is appropriate when "[t]he offender was a leader in a multiple offender situation." MCL 777.44(1)(a). When scoring this variable, the court must consider "[t]he entire criminal transaction." MCL 777.44(2)(a). A preponderance of the evidence supported the score. It is true that Farr suspected Stone of theft before March 6 and did not know that Baker had frequented his home before that date. On March 6 and April 10, however, Baker's conduct revealed his leadership role in the ongoing thievery and extortion. Baker forced his way into Farr's bedroom and threatened him and implied he possessed a weapon. It was Baker, not Stone, who directed Farr to drive them to the credit union and to withdraw money. Stone was not even present during the April 10 incident. Given this evidence, we discern no error in the court's finding.

Finally, Baker challenges his 10-point score for OV 19. "[OV] 19 is threat to the security of a penal institution or court or interference with the administration of justice or the rendering of emergency services." MCL 777.49(1). The statute demands scores of decreasing value for conduct of decreasing culpability:

> (a) The offender by his or her conduct threatened the security of a penal institution or court......... 25 points

> (b) The offender used force or the threat of force against another person or the property of another person to interfere with, attempt to interfere with, or that

-11-

results in the interference with the administration of justice or the rendering of emergency services......... 15 points

(c) The offender otherwise interfered with or attempted to interfere with the administration of justice......... 10 points

(d) The offender did not threaten the security of a penal institution or court or interfere with or attempt to interfere with the administration of justice or the rendering of emergency services by force or threat of force......... 0 points [*Id.*]

The prosecutor urged for a score of 15 points, noting that Baker threatened Farr with "further harm" if he reported the thefts to the police and took Farr's cell phone on March 6 to ensure his compliance. Defense counsel denied any such "obstruction." Rather, Farr simply chose to go to work and then bed and wait until the following day to report the March 6 incident. The court assigned 10 points and found that Baker successfully threatened Farr on March 6 and delayed the reporting of the offense.

On appeal, Baker does not challenge the accuracy of the grounds cited by the trial court. Instead, Baker contends that OV 19 should not have been scored because the presentence investigation report "merely states that he was 'vague and elusive during the presentence interview.' " This is completely irrelevant to the court's decision and we discern no ground to vacate the score.

As none of Baker's evidentiary challenges are meritorious, we now turn to his constitutional challenge. In scoring OVs 1, 8, 10, 14, and 19, the trial court relied on facts beyond those found by the jury. However, trial courts are still permitted to consider judicially found facts when imposing sentence as long as the court's findings are supported by a preponderance of the evidence. *Lockridge*, 498 Mich at 392 n 28; *People v Steanhouse*, 313 Mich App 1, 38; 880 NW2d 297 (2015). Even so, the trial court did not recognize when imposing sentence that the legislative sentencing guidelines are now advisory, not mandatory. Accordingly, we must remand to allow Baker the opportunity to decide whether he wishes to proceed with resentencing consistent with the *Crosby* procedure outlined in *Lockridge*, 498 Mich at 398.

We affirm Baker's convictions, but remand for further sentencing proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Karen M. Fort Hood
/s/ Elizabeth L. Gleicher
/s/ Colleen A. O'Brien

-12-